STATE of Minnesota, Respondent,

v.

Scott Allen PATTERSON, Appellant.

No. C7–97–487.

Supreme Court of Minnesota.

April 16, 1998.

John M. Stuart, Minnesota Public Defender, Bradford S. Delapena, Assistant State Public Defender, Minneapolis, for Appellant.

Hubert H. Humphrey III, State Attorney General, St. Paul, Susan Gaertner, Ramsey County Attorney, St. Paul, for Respondent.

## OPINION

PAGE, Justice.

Scott Allen Patterson was convicted by a Ramsey County jury of first-degree murder for the May 7, 1996, beating death of 71–year–old Jack Weiss, in St. Paul, Minnesota. Patterson was sentenced to a term of life in prison. In this direct appeal, the primary issue raised is whether the trial court denied Patterson a fair trial by admitting into evidence the terms of a plea agreement requiring an accomplice testifying at Patterson's trial to testify truthfully and completely. Patterson claims that the admission of this evidence resulted in the prosecutor and the judge vouching for the accomplice's credibility. In his pro se brief, Patterson raises three additional issues: (1) whether the trial court abused its discretion by allowing the introduction of evidence of other bad acts committed by Patterson; (2) whether he was denied a fair trial because the trial court failed to direct a mistrial upon introduction of "highly inflammatory and prejudicial hearsay testimony"; and (3) whether he was denied a fair trial by the trial court's failure to direct a not guilty verdict because of the state's failure to meet its burden of proof as to the "element of intent" required for first-degree murder. We affirm.

In April 1996, Jack Weiss, a 71–year–old retired airline mechanic, and his wife, Sharon, lived and operated a mail order antique business at 1864 Rome Avenue in St. Paul. In late April, the Weisses had the interior of their home painted by three individuals they found through an ad in a local newspaper.

At some point while the painters were working in the Weisses' home, Mrs. Weiss discovered that $500 was missing from her dresser drawer. The Weisses questioned the painters, and each denied any knowledge of the missing money. During this questioning, Mr. Weiss, who believed the money had been misplaced rather than stolen, told Mrs. Weiss that the money should have been kept in their safe. In fact, Michael Theyson, one of the painters, had stolen the money. When he learned that there was a safe in the Weisses' house, Theyson hatched a plan to burglarize the house and enlisted Patterson to help.

According to Theyson's testimony, he, Patterson, and a third individual—Rob Wilson—who was to be the getaway driver, carried out that plan on the evening of May 7, 1996. That evening, Theyson and Patterson entered the Weisses' property through the back gate and began putting nylon stockings over their faces to mask their identity. Patterson's stocking accidentally ripped as he was putting it on and, as a result, he threw it on the ground in the Weisses' backyard.

Patterson then knocked on the Weisses' door, and the two waited for someone to answer. When Mrs. Weiss opened the door, Theyson sprayed her with mace, causing her to scream. Once inside, Patterson ran down the hallway, while Theyson remained in the kitchen with Mrs. Weiss and took money from her purse. When Patterson returned to the kitchen about 5 minutes later, his hands were cut and bruised and had blood on them. Patterson was laughing and told Theyson that he had just killed "him," referring to Mr. Weiss. Patterson then forced Mrs. Weiss into the master bedroom. Following them, Theyson noticed Mr. Weiss's body lying on the hallway floor near the entrance to the master bedroom. Inside the master bedroom, Mrs. Weiss was ordered to lay on the floor and was covered with a blanket. Theyson and Patterson proceeded to burglarize the rest of the house, stealing money, jewelry, silverware, and other miscellaneous items. At some point during the

burglary, Patterson indicated that he was "going to do the old lady in." Theyson testified that although he begged him not to harm her, Patterson left the room without any response. When Patterson returned several minutes later with a bloody knife, he told Theyson that he had not killed her, but had cut her hand. After the burglary, Theyson and Patterson abandoned their plan to have Wilson pick them up. Instead, they fled the scene in the Weisses' car which was eventually abandoned, with the keys thrown into a sewer near the intersection of 28th Avenue and 29th Street.

Theyson and Patterson fled town by bus the next night, intending to go to San Diego, California, and on to Mexico. Theyson was apprehended on May 9, 1996, when the bus stopped in Denver, Colorado, and Patterson was apprehended 5 days later in San Diego. When apprehended, Patterson's hands were red and swollen with nicks and cuts in the area of his knuckles.

Mrs. Weiss testified that, at approximately 9:30 p.m. on the evening of May 7, 1996, she and her husband were watching television in their bedroom when the doorbell rang. She went to a side door near their kitchen, opened it, and two men entered the house. One of the men was tall and slender with dark hair, and the other was shorter.[1] Mrs. Weiss recognized the shorter man as one of the three painters who had painted the interior of their home in late April. Upon entering, the shorter man immediately sprayed her in the face with mace. Within 5 minutes of the two men entering the house, Mrs. Weiss was ordered to go into her bedroom, where the taller of the two men covered her with a blanket and then a sheet. Mrs. Weiss testified that, during the burglary, the taller man put a knife to her throat and, when she tried to pull it away, her right hand was cut.

Patterson was indicted for one count of first-degree murder and one count of second-degree murder for Mr. Weiss's death. Theyson was also charged in connection with Mr. Weiss's death, but eventually pled guilty to unintentional second-degree murder as part

---

1. Theyson is 5'7" and weighs approximately 160 pounds, and Patterson is 6'5" and weighs approximately 210 to 220 pounds.

of a plea agreement. The terms of Theyson's plea agreement required him to testify truthfully and completely at Patterson's trial. The plea agreement did not guarantee Theyson a specific sentence. However, at some point prior to Patterson's trial, Theyson's sentencing judge, who also happened to be Patterson's trial judge, indicated that, upon his truthful and complete testimony at Patterson's trial, Theyson would be sentenced to 12 years in prison. The state introduced evidence of these terms at Patterson's trial. The state also introduced evidence of two prior offenses by Patterson for the purpose of showing identity.

While this court has addressed the issue of vouching by prosecutors, the specific issue raised by Patterson has not been directly considered. *See Van Buren v. State*, 556 N.W.2d 548 (Minn.1996); *State v. Ture*, 353 N.W.2d 502, 516 (Minn.1984). Patterson argues that allowing the jury to hear the terms of the plea agreement, requiring his truthful and complete testimony, resulted in both the prosecutor and the court vouching for Theyson's credibility. Patterson reasons that the reference to "the truthfulness provision itself implies that the government knows the truth."

In *State v. Jones*, a case in which the prosecutor was permitted to inform the jury of plea agreements worked out with two accomplices in exchange for their truthful testimony, this court stated "[w]e have never held that plea negotiations granting favorable treatment to prosecution witnesses in return for truthful testimony are *per se unconstitutional * * *.*" 392 N.W.2d 224, 232 (Minn. 1986) (emphasis in original). The court went on to say that "inquiry before the jury into the details of the plea negotiations is not only proper but vital to a fair resolution of the issue of credibility." *Id.* at 233. In *State v.*

*Williams,* a case where two accomplices were reminded in front of the jury of their obligation under the terms of their plea agreement to testify truthfully, this court stated that it is "neither unconstitutional nor improper to remind an accomplice of the terms of the agreement, or that reduced charges and a more lenient sentence depend upon the accomplice's willingness to fulfill his or her part of the bargain." 418 N.W.2d 163, 168 (Minn.1988).

■ The issue of vouching, in the context of plea agreements, has been directly addressed by a number of federal courts of appeal.[2] The Eighth Circuit's treatment of this issue is illustrative of the federal view. In *United States v. Tate*, the Eighth Circuit explicitly joined with other federal circuits in holding "that mere inquiry by the government of its witnesses regarding their understanding of the [plea] agreements they have entered into does not in itself constitute vouching for the witness's credibility." 915 F.2d 400, 401 (8th Cir.1990). In joining the other circuits, the Eighth Circuit made it clear, however, that "[t]he prosecutor may not place the prestige of the government behind a witness, giving personal assurances of veracity; nor may the prosecutor suggest that information not introduced to the jury guarantees the accuracy of the witness's testimony" without engaging in vouching. *Id.;* accord *United States v. Lewis*, 10 F.3d 1086, 1089 (4th Cir.1993); *United States v. Kerr*, 981 F.2d 1050, 1053 (9th Cir.1992). In *United States v. Beasley*, the Eighth Circuit further explained that vouching occurs "when the government implies a guarantee of a witness's truthfulness, refers to facts outside the record, or expresses a personal opinion as to a witness's credibility." 102 F.3d 1440, 1449 (8th Cir.1996) (citing *United States v. Magee*, 19 F.3d 417, 421 (8th Cir.1994)).

**2.** *See, e.g., United States v. Necoechea*, 986 F.2d 1273 (9th Cir.1993); *United States v. Bowie*, 892 F.2d 1494 (10th Cir.1990); *United States v. Edelman*, 873 F.2d 791 (5th Cir.1989). A number of our sister states have also addressed this issue. *See, e.g., Jenner v. Leapley*, 521 N.W.2d 422, 427 (S.D.1994) (holding that "the mere statement in [a plea] agreement that a witness promises to speak truthfully does not by itself constitute improper vouching"); *State v. Kaster*, 148 Wis.2d 789, 436 N.W.2d 891, 895 (Ct.App.1989), *pet. rev.*

denied, 439 N.W.2d 142 (Wis.1989) (asking witness his understanding regarding a pre-trial agreement "is nothing more than a disclosure of facts affecting that credibility"); *People v. Buschard*, 109 Mich.App. 306, 311 N.W.2d 759, 763 (1981), *vacated on other grounds*, 417 Mich. 996, 334 N.W.2d 376 (1983), *reaff'd*, 129 Mich.App. 160, 341 N.W.2d 260 (1983) ("we cannot hold that any reference to a plea agreement containing a promise of truthfulness is in itself grounds for reversal") (emphasis omitted).

We see no reason to apply a different standard than the one set out by the Eighth Circuit in *Tate* and *Beasley*. Permitting the prosecutor to introduce evidence of the terms of a witness's plea agreement, including any truthfulness provision, while making sure that the prosecutor does not directly or by implication express an opinion as to the witness's credibility, creates a proper balance between the need for the defendant to be able to challenge the witness's credibility based on the plea agreement and the state's interest in having the jury understand the witness's obligation under the agreement and allows the jury to properly evaluate and weigh the witness's testimony. Thus, we conclude that testimony relating to the existence, the terms, including any truthfulness provision, and the witness's understanding of the plea agreement between the witness and the state, without more, does not constitute vouching.

■ In a sense, a truthfulness provision in a plea agreement is nothing more than a restatement of the obligation incumbent upon all witnesses testifying under oath. Further, to the extent that truthfulness provisions contained in plea agreements inherently place the prestige of the government behind the witness, as Patterson claims, there are safeguards in place to protect the defendant's rights. While we do not agree that it is inherent in such agreements that the government's prestige is placed behind the witness, it is clear that any such prestige will quickly dissipate once the defense cross-examines the witness, testing both the witness's memory, as well as credibility. *Jones,* 392 N.W.2d at 231–32 ("The fact that the testimony of a cooperating witness may be tainted by a contingent agreement with the government can be disclosed to the jury during cross-examination of the witness on the stand."). In addition, when the witness is the defendant's accomplice, and the accomplice testifies pursuant to a plea agreement, "the trial court must instruct the jury that the testimony of an accomplice, even if believed, is not alone of sufficient weight to justify a convic-

tion but that it must be corroborated by other evidence linking defendant to the crime alleged." *State v. LaJambe,* 300 Minn. 539, 541, 219 N.W.2d 917, 919 (1974).

■ In this case, the testimony underlying Patterson's complaint is as follows:

BY MS. THOMPSON:

Q   Mr. Theyson, how old are you?

A Twenty-three.

Q   And have you pled guilty to second degree unintentional murder regarding this incident?

A Yes, I have.

Q   And that plea was conditioned upon your testifying completely and truthfully in this trial; is that true?

A Yes.

Q   And with regard to that plea, is it your understanding that the state has not agreed to anything?

A Yes.

Q   Is it also your understanding that the court has indicated that upon your truthful and complete testimony, that there would be a sentence of 12 years?

A Yes.

Q   Do you also understand that that is less than what you would normally receive?

A Yes.

Q   And you understand that the state may ask for more time for you to serve?

A Yes.

Applying the standard we have adopted from *Tate* and *Beasley* to the facts of this case leads us to conclude that the trial court's admission of *Theyson's* testimony regarding his plea agreement did not constitute error. In eliciting this testimony, the prosecutor did not place the prestige of the government[3] behind Theyson, nor did the prosecutor at any time give personal assurances of Theyson's veracity, suggest that information not introduced into evidence guaranteed the accuracy of Theyson's testimony, imply a guar-

3. While we do not believe that the prosecutor's reference to Theyson's understanding of what the court was going to do with respect to sentencing placed the prestige of the court behind Theyson's testimony on the facts presented in this case, we caution prosecutors to take great care when making reference to the court's involvement with the plea agreement.

antee of Theyson's truthfulness, or express a personal opinion as to Theyson's credibility.[4] Thus, on the record before us, we are satisfied that no vouching took place and that Patterson's jury understood that it, and it alone, based on all of the evidence presented, was responsible for determining Theyson's credibility.

 Next, we address Patterson's claim that the trial court abused its discretion by admitting at trial evidence of other bad acts committed by Patterson. As a general rule, evidence of other crimes or misconduct is not admissible to prove the defendant's character for the purpose of showing that he or she acted in conformity with that character. *State v. DeWald,* 464 N.W.2d 500, 502 (Minn. 1991). Such evidence, however, may be admitted for the limited purpose of showing motive, intent, absence of mistake or accident, identity, or a common scheme or plan. Minn. R. Evid. 404(b). The decision to admit such evidence rests within the sound discretion of the trial court and will not be set aside absent a clear abuse of that discretion. *State v. Slowinski,* 450 N.W.2d 107, 113 (Minn.1990).

Here, the state's theory of the case was that during the burglary of the Weisses' home, Patterson began acting irrationally and, without provocation, became violent, resulting in Mr. Weiss's death and Mrs. Weiss being cut on the hand. Patterson's theory was that although Patterson was present in the Weisses' home during the burglary, it was Theyson who killed Mr. Weiss. The prosecutor sought to introduce, and the trial court admitted, for purposes of identity, evidence of two incidents in which Patterson violently, and without provocation, assaulted other individuals. The first incident involved an attack on a counselor at the Minnesota Correctional Facility at Red Wing where Patterson was a resident. The counselor

was investigating a loud noise on the second floor of a building at the school late on the evening of April 8, 1992, when, without any provocation, Patterson swung a steel bar at the counselor as the counselor entered a hallway. As a result, the counselor was knocked to the floor and Patterson proceeded to strike the counselor several more times and then kick the counselor in the head and face 6 to 8 times. The second incident involved a September 1993 guilty plea by Patterson to aggravated robbery. As part of the plea, Patterson, in addition to acknowledging that he took money from the victim, admitted to hitting the victim in the jaw, knocking him to the ground unconscious. Based on the record before us, we conclude that the evidence admitted at Patterson's trial relating to each of these incidents was properly admitted for the purpose of establishing identity, and, therefore, the trial court did not abuse its discretion.

With respect to the remainder of Patterson's pro se claims, we have thoroughly reviewed the record and conclude that those claims have no merit.

Affirmed.

---

4. We note that Theyson's credibility was vigorously challenged on cross-examination, giving the jury ample opportunity to weigh Theyson's motives for testifying as he did. Further, the trial court instructed the jury that deciding questions of fact was the jury's exclusive responsibility; that jury members were the sole judges of the credibility of witnesses and the weight to be given each witness's testimony; that because

Theyson was Patterson's accomplice, Patterson could not be found guilty based on Theyson's testimony unless that testimony was corroborated; and that if she, as judge, said or did anything which seemed to indicate her opinions about the facts of the case, it was to be disregarded. We also note that the record contains ample corroboration of Theyson's testimony.