**STATE of Minnesota, Respondent,**

v.

**Lamonte Rydell MARTIN, Appellant.**

No. A07–1262.

Supreme Court of Minnesota.

Oct. 8, 2009.

Leslie J. Rosenberg, Assistant State Public Defender, St. Paul, MN, for appellant.

Lori Swanson, Attorney General, St. Paul, MN, and Michael O. Freeman, Hennepin County Attorney, Jean Burdorf, Assistant County Attorney, Minneapolis, MN, for respondent.

## OPINION

DIETZEN, Justice.

Appellant Lamonte Martin was indicted for first-degree premeditated murder, Minn.Stat. § 609.185(a)(1) (2008), and crime committed for the benefit of a gang, Minn.Stat. § 609.229, subd. 2 (2008), for the shooting death of Christopher Lynch. Martin was automatically certified to stand trial as an adult under Minn.Stat. § 260B.007, subd. 6(b) (2008). A Hennepin County jury found him guilty of both counts. The district court entered judgment of conviction of first-degree premeditated murder against Martin and sentenced him to life in prison without the possibility of release. We affirm.

On the evening of May 3, 2006, police responded to a report of a shooting in a residential neighborhood in north Minneapolis. When police arrived, Lynch had already been taken to the hospital, where he was pronounced dead. An autopsy re-vealed that Lynch had been shot 11 to 13 times. Through their investigation, the police learned that Martin, Cornelius Jackson, and Jonard McDaniel chased Lynch and his cousin, Jermaine Mack–Lynch, and shot Lynch.

The State indicted Martin, Jackson, and McDaniel for the murder of Lynch. Specifically, Martin was indicted for first-degree premeditated murder and crime committed to benefit a gang. The State moved for joinder of the trials of Martin, Jackson, and McDaniel. The defendants objected to the joinder motion. Following a hearing, the court granted the motion. Subsequently, the State successfully moved to sever the McDaniel trial.

During voir dire, the prosecutor exercised a peremptory challenge of potential Juror 43, and Martin raised a *Batson* challenge. *See Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Initially, the court denied the peremptory challenge, but after further questioning of the juror, the court concluded that the prosecutor had established a race-neutral reason for striking the potential juror.

At the combined trial, the State's theory was that Lynch was an innocent victim and that his murder was "collateral damage" in an ongoing gang dispute. The State presented evidence that Mack–Lynch was a member of the Tre Tre Crips gang and that the 19 Block Dipset gang was a rival gang to which Martin, Jackson, and McDaniel belonged. The State also presented evidence that the two gangs have had violent encounters.

Mack–Lynch testified that on the day in question, he and Lynch were walking to the home of Mack–Lynch's brother, Charles Pettis. As they were walking, they saw a white Malibu in which Martin was the driver and Jackson and McDaniel were passengers. After the car slowed

down and the occupants looked at Mack–Lynch and Lynch, the car stopped. Jackson and Martin got out and started chasing them.

Mack–Lynch and Lynch ran down the alley to the back of Pettis's house, where Lynch stopped because he was short of breath. Mack–Lynch continued running down the alley, thinking that Jackson and Martin would follow him because he was a gang member. Mack–Lynch then doubled back to the front of Pettis's house and told his brother that "One Nines" were chasing him. Subsequently, they heard gunshots and saw Jackson and Martin in a yard across the street firing shots with handguns into the backyard of a nearby house. Mack–Lynch and Pettis ran across the street and found Lynch wounded in the backyard. McDaniel then drove the white car into the alley. Jackson and Martin jumped in the car and the three drove away. According to Mack–Lynch, Jackson was wearing a black hat, and Martin was wearing a red hat.

Mack–Lynch admitted that he had a 2005 conviction for unlawful firearm possession and that currently he was under indictment for first-degree murder for a 2006 homicide. He denied having made any type of "deal" with the prosecution in exchange for his testimony.

Pettis also testified that he saw Jackson and Martin standing in a yard across the street. Pettis then heard shots fired. He saw Jackson and Martin get into a white car and drive away. Pettis and Mack–Lynch then found Lynch wounded in the backyard. During an interview with the police that same day, Pettis denied knowing the identity of the shooters. But when the investigator left the interview room, Pettis stated in a phone call to a third party: "I know who did it" but "like I'd really tell these motherf* * *ers [police] who shot my cousin." According to Pettis,

he lied to the police because he "wanted to deal with it my way" by "getting revenge . . . on the street." Subsequently, Pettis saw physical evidence from the murder scene, changed his mind, and decided to cooperate. On cross-examination, Pettis admitted prior felony convictions for car theft and robbery and that he currently had a pending charge for aggravated robbery. He denied getting a deal from the prosecution in exchange for his testimony.

Ten-year-old S.H., who lived next door, witnessed the shooting from his back porch. He could not see the two shooters' faces, but he did notice both men were wearing hats. Other witnesses testified that they saw two men flee and get into a white car. Witnesses also stated that one of the men was wearing a red baseball cap.

The State presented testimony that Martin, Jackson, and McDaniel made admissions to various gang members regarding their involvement in Lynch's murder. Paris Patton, a member of the 19 Block Dipset gang, and Kiron Williams, a member of the Vice Lords gang, were in federal custody on narcotics charges. They agreed to testify in exchange for the possibility of a reduced sentence in federal court. Both testified that Martin, Jackson, and McDaniel were members of the 19 Block Dipset gang. Patton testified that about three days after Lynch was killed, McDaniel asked him if he had a gun because he had gotten rid of his after using it "on that little boy" who was with Mack–Lynch. About a month after the murder, Patton overheard Jackson say Lynch was on his knees begging for his life when Jackson shot him. Williams testified that McDaniel, Martin, and Jackson all told him they were involved in killing Lynch. According to Williams, Martin bragged to him about chasing Mack–Lynch and then killing the person who was with him. Williams also testified that Jackson told

him that he chased Mack–Lynch and Lynch, that Mack–Lynch got away, and then he caught up with Lynch, who pleaded for his life before he was shot.

Minneapolis Police Captain Michael Martin, a member of the special operations division, testified as the State's gang expert. He explained that the 19 Block Dipset gang operates primarily on the north side of Minneapolis and has engaged in murders, drive-by shootings, assaults, and drug crimes. He indicated that retaliation and respect are "the foundation for the gang culture." Several other witnesses testified about incidents in which they were shot at or where persons they knew had been killed by gang members. Other police officers also testified regarding incidents involving 19 Block Dipset gang members and criminal activities in north Minneapolis.

The jury found Martin guilty of first-degree premeditated murder and crime committed for the benefit of a gang (with an underlying crime of premeditated murder). The district court entered judgment of conviction of first-degree premeditated murder against Martin, and sentenced him to life in prison without the possibility of release. This appeal followed.

## I.

▮▮▮ Martin argues that sentencing a defendant who was a juvenile at the time the crime was committed to life in prison without the possibility of release (LWOR), under Minn.Stat. §§ 260B.007, subd. 6(b), and 260B.101, subd. 1 (2008), violates the Eighth Amendment's prohibition against "cruel and usual punishment."[1] We review the question of whether a statute is constitutional de novo. *State v. Caulfield*, 722 N.W.2d 304, 310 (Minn.2006).[2]

In *State v. Chambers*, the defendant, who was a juvenile at the time of the charged offenses, asserted that the sentence of LWOR as applied to him violated the prohibition of cruel and unusual punishment under the federal and state constitutions. 589 N.W.2d 466, 479–80 (Minn. 1999). We observed that in determining whether a sentence is "cruel and unusual," we must look to the "evolving standards of decency that mark the progress of a maturing society." *Id.* at 480 (quoting *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958)). We held that the fact that Chambers was the only individual to be sentenced to LWOR for a crime committed while under the age of 18 did not result in a constitutional violation. *Id.*

Martin urges us to reconsider our holding in *Chambers* on the ground that the differences between juveniles under 18 and adults renders them less responsible for their conduct than adults and, therefore, a sentence of LWOR is unconstitutional as cruel and unusual punishment. He urges

1. Minnesota Statutes § 260B.101, subd. 1 (2008) gives the juvenile court jurisdiction over "delinquent" children. "The term delinquent child does not include a child alleged to have committed murder in the first degree after becoming 16 years of age." Minn.Stat. § 260B.007, subd. 6(b).

2. Martin argues that the automatic certification of juveniles to adult court, pursuant to Minn.Stat. §§ 260B.007, subd. 6(b), and 260B.101, subd. 1, violates equal protection and due process of law under the federal and state constitutions. We rejected these constitutional arguments in *State v. Behl*, 564 N.W.2d 560 (Minn.1997). Martin concedes that these issues were not raised before the district court but argues that we should address them in the interests of justice. We may address an issue for the first time on appeal in the interests of justice if doing so would not work an unfair surprise on a party. *See State v. Henderson*, 706 N.W.2d 758, 759 (Minn.2005); Minn. R.Crim. P. 28.02, subd. 11. Martin failed to present a sufficient basis for us to reconsider our decision in *Behl;* therefore, we decline to review the issue.

us to overrule *Chambers* in light of *Roper v. Simmons,* 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005).

 We are "extremely reluctant to overrule our precedent under principles of *stare decisis." State v. Lee,* 706 N.W.2d 491, 494 (Minn.2005). We require a "compelling reason" before a prior decision will be overruled. *Id.*

In *Roper,* the Supreme Court held that the execution of individuals who were under 18 years of age at the time of their crimes is cruel and unusual punishment, abrogating prior decisions of that Court. 543 U.S. at 573–74, 125 S.Ct. 1183. The Court concluded that there are three "general differences" between juveniles under 18 and adults: a general lack of maturity; greater susceptibility to outside pressures and influences; and a less well-formed character than that of an adult. *Id.* at 569–70, 125 S.Ct. 1183. These differences "render suspect any conclusion that a juvenile falls among the worst offenders" and should receive the death penalty. *Id.* at 570, 125 S.Ct. 1183.

*Roper* does not provide a compelling reason to overrule our decision in *Chambers.* The Supreme Court affirmed the decision of the Missouri Supreme Court to impose a sentence of LWOR against Roper for committing first-degree murder. *Id.* at 560, 125 S.Ct. 1183. And the Court stated that "[w]hen a juvenile offender commits a heinous crime, the State can exact forfeiture of some of the most basic liberties...." *Id.* at 573–74, 125 S.Ct. 1183. The Court concluded that LWOR for a juvenile is a more palatable alternative to the juvenile death penalty. *See id.* at 572, 125 S.Ct. 1183 ("To the extent the juvenile

death penalty might have residual deterrent effect, it is worth noting that the punishment of life imprisonment without the possibility of release is itself a severe sanction, *in particular for a young person.").*

Martin argues that there is an emerging consensus against sentencing juveniles to LWOR.[3] He relies on language in *Roper* in which the Court determined that there were "evolving standards of decency" against the juvenile death penalty. *Id.* at 561, 563, 125 S.Ct. 1183. For example, the Court observed that 30 states prohibit the juvenile death penalty. *Id.* at 559–60, 125 S.Ct. 1183. But only seven states prohibit juvenile LWOR. Amnesty International Human Rights Watch, *The Rest of Their Lives: Life without Parole for Youth Offenders in the United States in 2008,* Executive Summary Figure 1, May 2008, available at www.hrw.org/backgrounder/2008/us1005/us1005execsum.pdf (hereinafter *"Amnesty").* The Court also noted that only a few juveniles were executed after the Court affirmed the death penalty for 16– or 17–year–olds in *Stanford v. Kentucky,* 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989). *Roper,* 543 U.S. at 564–65, 125 S.Ct. 1183. In contrast, there are currently 2,484 juvenile offenders serving LWOR. *Amnesty,* Summary Figure 1. Martin has failed to present evidence showing an emerging consensus against sentencing juveniles to LWOR.

Finally, Martin argues that the Minnesota Constitution prohibits cruel *or* unusual punishments, which means that a court should prohibit a punishment if it is either

---

3. Martin also argues that international law weighs against juvenile LWOR. While the Court did look at international law in *Roper,* it did so for "confirmation" of its determination, specifically stating that "[t]his reality does not become controlling, for the task of interpreting the Eighth Amendment remains our responsibility." 543 U.S. at 575, 125 S.Ct. 1183.

cruel *or* unusual.[4] *See State v. Mitchell,* 577 N.W.2d 481, 488 (Minn.1998) (noting difference between the Minnesota Constitution and the Eighth Amendment). Martin argues that LWOR is both cruel and unusual under the Minnesota Constitution. To support his argument, Martin cites to several cases in other states where a LWOR sentence for a juvenile was reversed; all of these cases, however, were as-applied challenges in which the sentenced juvenile was under the age of 16. *See People v. Miller,* 202 Ill.2d 328, 269 Ill.Dec. 503, 781 N.E.2d 300 (2002) (15 years old); *Workman v. Commonwealth,* 429 S.W.2d 374 (Ky.1968) (14 years old); *Naovarath v. State,* 105 Nev. 525, 779 P.2d 944 (1989) (13 years old). In contrast, Martin was only six weeks from his eighteenth birthday when he shot Lynch.[5] While states with similar constitutions have found LWOR unconstitutional for juveniles under the age of 16, Martin offered no authority that LWOR is unconstitutional for a 17–year–old.

Martin has failed to carry his heavy burden of demonstrating a compelling reason to overturn *Chambers.* Nor did Martin make any showing that this punishment was disproportionate as applied to him. We hold that the punishment of LWOR is not unconstitutional as applied to Martin.

## II.

■■■ Martin argues that the district court erred by granting the State's motion for joinder of his and Jackson's cases for trial. Review of joinder decisions requires "an independent inquiry into [whether] any substantial prejudice to defendants may have resulted from the joinder." *State v. Blanche,* 696 N.W.2d 351, 370 (Minn.2005) (quoting *State v. DeVerney,* 592 N.W.2d 837, 842 (Minn.1999)). Under Minn. R.Crim. P. 17.03, subd. 2(1), a district court should consider the following factors in determining whether multiple defendants' felony cases should be joined for trial: (1) the nature of the offense; (2) the impact on the victim; (3) the potential prejudice to the defendant(s); and (4) the interests of justice. This rule neither favors nor disfavors joinder. *Santiago v. State,* 644 N.W.2d 425, 446 (Minn.2002).

We have approved joinder of criminal trials in cases where codefendants acted in close concert with one another. *E.g., Blanche,* 696 N.W.2d at 371. In doing so, we have emphasized the similarity of the charges and evidence. *Id.; State v. Greenleaf,* 591 N.W.2d 488, 499 (Minn. 1999) ("The identical nature of the charged offenses and the nearly identical evidence against each defendant supports the trial court's decision to join [defendants] for trial.").

Martin argues that he and Jackson were not "alleged to have developed an intricate scheme together or acted in such close concert" and, therefore, the nature of the offenses does not favor joinder. The State argues that both Jackson and Martin were charged with the same crimes and that the evidence against them was virtually identical.

We agree with the district court that the nature of the offenses favored joinder. Martin and Jackson were charged with the same crimes. As in *Blanche,* the overwhelming "majority of the evidence presented was admissible against both," 696 N.W.2d at 371, and substantial evidence was presented that both Martin and Jack-

---

4. This is in contrast to the United States Constitution, which prohibits cruel *and* unusual punishment. U.S. Const. amend. VIII.

5. Lynch was killed May 3, 2006. Martin turned 18 on June 27, 2006.

son worked "in close concert with one another" to kill Lynch, *id.*

■ Martin also argues that separate trials would not result in trauma to the victim or other witnesses. Potential trauma to either the victim or an eyewitness to a crime is a factor that weighs in favor of joinder. *Id.* The district court concluded that the State's main witnesses—Jermaine Mack–Lynch, the intended target, other family members of Lynch's, and S.H.— would be traumatized by multiple trials. The record supports the district court's conclusion. Here, the potential trauma to S.H., a 10–year–old boy who saw the murder from his porch, is significant. *See id.* (reasoning that joinder is favored where young children will testify as eyewitnesses to a murder). Consequently, this factor supports joinder.

■ According to Martin, the contrast between Jackson's "weak alibi defense" and his argument that the State could meet its burden of proof "unfairly prejudiced the jury against appellant." Joinder is not appropriate when there would be substantial prejudice to the defendant, which can be shown by demonstrating that codefendants presented "antagonistic defenses." *Santiago,* 644 N.W.2d at 446. Antagonistic defenses occur "when the defenses are inconsistent," and "the jury is forced to choose between the defense theories advocated by the defendants." *Id.*

Jackson presented evidence that implied McDaniel was one of the shooters, but did not present testimony to prove that Martin was one of the shooters. Further, Jackson and Martin "regularly adopted the motions and objections of the other." *Id.* (citing *State v. Hathaway,* 379 N.W.2d 498, 502 (Minn.1985)). Thus, the jury was not

forced to choose between Jackson's and Martin's defenses; rather, the jury had "to choose between the state's theory of the case and each defendant's theory of the case." *Greenleaf,* 591 N.W.2d at 499.

■ Further, the district court found that the interests of justice favored joinder because "separate trials would drag on for a lengthy period of time and ... the evidence is likely to be nearly the same in each trial." The length of separate trials is a legitimate factor in deciding to join cases. *State v. Powers,* 654 N.W.2d 667, 675–76 (Minn.2003) (holding that the extended duration of multiple trials favored joinder). Several of the State's witnesses were gang members, and there was some risk that these witnesses would be unavailable or unwilling to testify during another trial. *See Blanche,* 696 N.W.2d at 372 (holding that the risk of gang members' unavailability during second trial supported joinder).

We conclude that no substantial prejudice resulted from the joinder and, therefore, the cases of Martin and his codefendant were properly joined for trial.

### III.

■ Martin argues that the district court erred in sustaining the prosecutor's peremptory challenge of a prospective juror. "Peremptory challenges allow a party to strike a prospective juror that the party believes will be less fair than some others and, by this process, to select as final jurors the persons they believe will be most fair." *State v. Reiners,* 664 N.W.2d 826, 833 (Minn.2003). The Equal Protection Clause of the Fourteenth Amendment, however, prohibits purposeful racial discrimination in jury selection.[6] U.S. Const.

---

6. Martin also argues that the Minnesota Constitution requires that courts examine reasons

for striking minority jurors with a higher degree of scrutiny than the U.S. Constitution

amend. XIV; *Miller–El v. Dretke*, 545 U.S. 231, 238, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) (citing *Georgia v. McCollum*, 505 U.S. 42, 44, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992)); *Batson v. Kentucky*, 476 U.S. 79, 84, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) (citing *Swain v. Alabama*, 380 U.S. at 203–04, 85 S.Ct. 824). We have adopted the *Batson* three-step framework for determining whether a peremptory challenge is motivated by racial discrimination. *State v. Wren*, 738 N.W.2d 378, 387 (Minn.2007); *see also* Minn. R.Crim. P. 26.02, subd. 6a(3).

▇▇▇▇▇ Under *Batson:* (1) the defendant must make a prima facie showing that the prosecutor executed a peremptory challenge on the basis of race; (2) the burden then shifts to the prosecution to articulate a race-neutral explanation for striking the juror in question; and (3) the district court must determine whether the defendant has carried the burden of proving purposeful discrimination. *Purkett v. Elem*, 514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). The first step provides that the defendant must show that one or more members of a racial group have been peremptorily excluded from a jury and "that circumstances of the case raise an inference that the exclusion was based on race." *Reiners*, 664 N.W.2d at 831 (internal quotation marks omitted). A defendant can make a prima facie case of discriminatory jury selection by "the totality of relevant facts" of a prosecutor's conduct in the defendant's own trial. *Miller–El*, 545 U.S. at 239, 125 S.Ct. 2317

(citing *Batson*, 476 U.S. at 94, 96, 106 S.Ct. 1712). Under the second step, the issue is the facial validity of the prosecutor's explanation, which need not be persuasive or even plausible. Specifically, "[u]nless discriminatory intent is inherent in the explanation, the reason offered [is] deemed race neutral." *Purkett*, 514 U.S. at 768, 115 S.Ct. 1769. "It is not until the third step that the persuasiveness of the justification becomes relevant." *Id.* (emphasis omitted). The defendant ultimately carries the burden of persuasion to demonstrate the existence of purposeful discrimination; this burden never shifts from the opponent of the strike. *See Reiners*, 664 N.W.2d at 832.

▇▇▇▇▇ Because the existence of racial discrimination in the exercise of a peremptory strike is a factual determination, we give great deference to the district court's ruling and will not reverse unless it is clearly erroneous. *See Snyder v. Louisiana*, 552 U.S. 472, 128 S.Ct. 1203, 1207, 170 L.Ed.2d 175 (2008). We afford great deference because "the record may not reflect all of the relevant circumstances that the court may consider." *State v. Pendleton*, 725 N.W.2d 717, 724 (Minn. 2007).

Juror 43, an African–American male,[7] was the first African–American juror to be interviewed during voir dire of the venire.[8] Initially, the district court asked him questions regarding his answer to a juror questionnaire about his opinions of the criminal

---

requires. But his arguments under the Minnesota Constitution run parallel to those under the United States Constitution and can be analyzed in the same manner. Furthermore, Martin did not raise any specific objections regarding the Minnesota Constitution in district court, which generally precludes a party from raising such objections at a later date. *See State v. Frazier*, 649 N.W.2d 828, 839 (Minn.2002) (refusing to consider a de-

fendant's equal protection argument based on state constitution raised for the first time on appeal).

7. Martin is also an African American.

8. Juror 47, who was later seated as a juror in the case, was the only African–American member of the jury.

justice system, where he wrote, "Do African American/minorities receive the same treatment as nonminorities?" He explained that he questioned whether people of color are "being treated equally when there is a hearing and when punishment or time to be served is fair." He believed that people of color received harsher punishments and may not receive fairness and equal treatment. He further stated, however, that his concerns would not affect his ability to be a fair and impartial juror. He admitted that he had a cousin who may have been wrongfully convicted of a crime. He also acknowledged that his coworker was the uncle of Lynch.

The prosecutor exercised a peremptory challenge to Juror 43. The defense asserted a *Batson* challenge. The prosecutor responded that the juror was struck because he did not feel that the criminal justice system treated minorities fairly, he believed that persons of color receive harsher punishment, his relatives believed that his cousin was wrongfully convicted of a crime, and the victim's aunt told the prosecutor that Juror 43 "might not be a good person for the case." The district court denied the peremptory challenge on the ground that the State failed to satisfy the second *Batson* prong, requiring it to articulate a race-neutral explanation for striking the juror.

The prosecutor then questioned Juror 43. The juror testified that his cousin's conviction involved a dispute between his cousin and his cousin's girlfriend over who was responsible for injuries suffered by his

cousin's child.[9] Based on the opinion of his relatives, he concluded that it was possible his cousin was wrongfully convicted. Also, he had conversations with undisclosed people who said that minorities are incarcerated for a longer length of time for certain crimes than nonminorities. He stated, "Am I taking it as a fact? No. But it is something that stays in my mind."

Subsequently, the prosecutor renewed his peremptory challenge. Based on its analysis of the second and third prongs of *Batson*, the district court sustained the peremptory challenge. The court concluded that the reasons given by the prosecutor were race neutral, and that the prosecutor did not show any evidence of racial bias.

On appeal, Martin makes two arguments. First, Martin argues that the district court should be alert for a prosecutor's subconscious, implicit bias, in addition to the more obvious and explicit purposeful discrimination. Martin does not cite to any cases that support his argument that the district court should look to implicit, in addition to explicit, bias in *Batson* challenges, nor does he detail how a court should investigate implicit bias.[10] Our case law under *Batson* is well established. *See, e.g., State v. Wren,* 738 N.W.2d 378, 387–88 (Minn.2007); *State v. Bailey,* 732 N.W.2d 612, 618 (Minn.2007); *State v. Gomez,* 721 N.W.2d 871, 883–84 (Minn.2006); *Blanche,* 696 N.W.2d at 364–65; *Reiners,* 664 N.W.2d at 831–32; *State v. McRae,* 494 N.W.2d 252, 253–54 (Minn.1992). We

9. We note that this dispute occurred in Hennepin County and was most likely prosecuted by the Hennepin County Attorney's Office, the same office that was prosecuting the present case.

10. Martin argues that the court should take the prosecutor's comment that he took personal offense at the *Batson* challenge as evidence of implicit bias. Martin offers no support for his argument that taking offense at a *Batson* challenge means that there was bias. Furthermore, there is no evidence that the district court did not consider the prosecutor's demeanor, including his taking offense, along with the demeanor and answers of the potential juror in making its decision.

see no reason to extend existing law to include "implicit bias."

Second, Martin argues that by allowing prosecutors to strike potential jurors when they have doubts about the fairness of the judicial system towards minorities, potential minority jurors will be disproportionately affected. He relies on *State v. McRae*, 494 N.W.2d 252 (Minn.1992), to support this claim.

In *McRae*, we considered whether the prosecutor had articulated a facially valid basis supported by the record for peremptorily excluding the only black juror on the jury venire panel. *Id.* at 253, 257–58. According to the prosecutor, the juror was excluded, in part, due to her responses that she could not be impartial because of her feelings about the criminal justice system. *Id.* at 257. We observed that the exaggeration by the prosecutor in making this explanation was "troubling." *Id.* The prosecutor's questions about the fairness of the system to minorities had not been asked of any other juror to that point, and when first asked if the system is fair, the juror responded that the system is "generally" fair. *Id.* at 254. The prosecutor "pressed" the juror to find fault with the system, but she never stated "the system is unfair." *Id.* at 254–56.

We also questioned whether another of the prosecutor's reasons for striking the juror was race neutral. *Id.* at 257. The prosecutor said he struck the African-American juror because "he believed she might refuse to find defendant guilty simply because defendant was also a black person." *Id.* We noted that:

> *Batson* expressly forbids this type of reasoning to enter into the jury selection process. "[T]he prosecutor may not rebut the defendant's prima facie case of discrimination by stating merely that he challenged jurors of the defendant's race on the assumption—or his intuitive judg-

ment—that they would be partial to the defendant because of their shared races."

*Id.* (quoting *Batson*, 476 U.S. at 97, 106 S.Ct. 1712).

We ultimately concluded in *McRae* that "the prosecutor's examination of the juror ... fail[ed] to support the explanation given by the prosecutor for striking the juror," and we suggested that "the prosecutor's questioning was prompted by the juror's race...." *Id.* at 257. Further, we concluded that the district court failed to engage in the three-step analysis required by *Batson* to resolve the issue of whether the prosecutor's explanation was a pretext for purposeful discrimination. *Id.* at 258.

Unlike *McRae*, the district court in this case followed the *Batson* analysis. *See Bailey*, 732 N.W.2d at 621 (rejecting *Batson* challenge and distinguishing *McRae*, in part, because the district court performed the required analysis under *Batson*). Before voir dire, all jurors were asked the same questions in the juror questionnaire about their opinions of the criminal justice system and any concerns about how that system treats people of color. *See State v. McDonough*, 631 N.W.2d 373, 385–86 (Minn.2001) (rejecting *Batson* challenge and distinguishing *McRae*, in part, because the jurors were all asked the same questions).

Based on its review of *Batson*, the district court concluded that the prosecutor articulated a race-neutral explanation for striking the juror in question, and that Martin failed to carry his burden of proving purposeful discrimination. The court supported its conclusions with findings that the responses of Juror 43 about the fairness of the criminal justice system toward African Americans and his cousin's conviction were not "forthcoming." The district court noted that Juror 43 did not

provide specific reasons or facts underlying his views on these subjects. And the district court expressed concern that Juror 43 believed that his cousin may have been wrongfully convicted, and the juror worked with the victim's uncle. On this record, we cannot say that the findings of the district court are clearly erroneous.

We have consistently held that a family member's involvement with the legal system is a legitimate race-neutral reason for the State to exercise a peremptory challenge. *Bailey*, 732 N.W.2d at 619–20 (upholding a peremptory challenge against a "juror of color" because of inconsistencies in her answers about her brother-in-law's conviction for domestic abuse and because some of answers seemed to indicate she might feel a "kinship" with the defendant); *Gomez*, 721 N.W.2d at 884 (upholding peremptory challenge because potential juror indicated her father had been tried and convicted for sexually abusing her half-sister and that she thought her father was wrongfully convicted); *Reiners*, 664 N.W.2d at 830–32 (upholding a peremptory challenge against an African–American woman because of her "significant exposure to law enforcement" from her father's job as a police officer in Atlanta and her participation in police training while in high school). Here, the juror's belief that his cousin may have been wrongfully convicted and the fact that the juror worked with the victim's uncle were race-neutral reasons for excluding the juror.

We conclude that the district court properly followed the *Batson* analysis, and that its decision to sustain the peremptory challenge is not clearly erroneous. Therefore, we affirm the district court.

## IV.

■ Martin argues prosecutorial misconduct deprived him of a fair trial. Our standard of review of alleged prosecutorial misconduct depends on whether or not an objection was made at trial. When an objection was made and we conclude the prosecutor committed misconduct, we apply a two-tiered harmless-error analysis. Specifically, in cases involving unusually serious prosecutorial misconduct, we review the conduct to determine whether it was harmless beyond a reasonable doubt. *State v. Wren*, 738 N.W.2d 378, 390 n. 8 (Minn.2007) (citing *State v. Caron*, 300 Minn. 123, 127–28, 218 N.W.2d 197, 200 (1974)). For less serious misconduct, we review the conduct to determine whether it likely played a substantial part in influencing the jury to convict. *Id.*

■ When an objection was not made to alleged prosecutorial misconduct, we review under a modified plain-error test. *See State v. Ramey*, 721 N.W.2d 294, 302 (Minn.2006). The defendant must prove an error was made that was plain. *Id.* If plain error is established, the burden shifts to the prosecution to demonstrate that the error did not affect substantial rights. *Id.* An error affects a defendant's substantial rights only if there is a reasonable probability that the error actually impacted the verdict. *Id.* If these three prongs are met, "the [appellate] court then assesses whether the error should be addressed to ensure fairness and the integrity of the judicial proceedings." *Id.*

Martin has identified numerous instances of alleged prosecutorial misconduct that occurred during the questioning of witnesses and during closing argument.

### 1. Questioning of witnesses

■ Martin claims that the prosecutor erred by asking one witness if he was in danger from testifying and by using the term "gangster," and not "gang member,"

in one question.[11] Martin objected, the objections were sustained, and the jury was ordered to disregard the testimony. Martin has provided no legal authority to support his argument that the questions constituted misconduct. In some instances, such questions may be proper. *See, e.g., State v. McArthur*, 730 N.W.2d 44, 51–52 (Minn.2007) (holding that it is permissible for prosecutors to elicit information about fear or threats in order to explain a witness's reluctance to testify). And even if the questions were improper, any misconduct was harmless beyond a reasonable doubt.[12] These were brief questions in a seven-day trial, curative instructions were given, and there was overwhelming evidence in support of Martin's guilt. *See State v. Pendleton*, 706 N.W.2d 500, 509 (Minn.2005) (holding that prosecutorial misconduct may be cured by district court instruction); *see also State v. Wermerskirchen*, 497 N.W.2d 235, 243 (Minn. 1993) (same).

## 2. Closing argument

Martin raises several incidents of alleged prosecutorial misconduct. Initially, Martin argues that the prosecutor misstated the burden of proof during closing argument. Prosecutors improperly shift the burden of proof when they imply that a defendant has the burden of proving his innocence. *See State v. Whittaker*, 568 N.W.2d 440, 451–52 (Minn.1997). A prosecutor's misstatement of the burden of proof is "highly improper" and constitutes misconduct. *State v. Hunt*, 615 N.W.2d 294, 302 (Minn.2000). But an argument that points out the difference between a criminal case and the civil preponderance-of-the-evidence standard is not misconduct provided the prosecutor also correctly states the reasonable-doubt standard. *Id.*

Martin also contends that the prosecutor attempted to reduce the State's burden of proof. Specifically, the prosecutor told jurors that "when liberty interests are at stake it's only fair" that the burden rests with the prosecution, but even with the presumption of innocence, many people are still convicted and that proof beyond a reasonable doubt was "a stiff burden." Martin did not object.

We have not previously decided whether it is improper for a prosecutor to state that, even with the presumption of innocence, many people are convicted. We conclude that the prosecutor's argument did not misstate the burden of proof or shift the burden of proof; rather, it was a legitimate explanation of the State's burden. Thus, we see no error, let alone plain error. *Cf. Ramey*, 721 N.W.2d at 302 (holding that plain error exists where a ruling contravenes case law).

Martin also argues that the prosecutor implied that Martin and Jackson had a duty to testify before the grand jury. The State contends that the prosecutor responded to Jackson's argument. During closing argument, Martin argued that the police "presumed" Jackson was guilty, that the prosecution picked the evidence it wanted to present to the grand jury, and that Jackson had no right to testify before the grand jury. The prosecutor responded

---

11. Martin also claims that the prosecutor, through cross-examination, implied that one of the defense witnesses had been intimidated. The record, however, reveals that the questions related to possible witness collusion, not intimidation. Martin does not argue that it would be improper to question a witness about collusion.

12. By holding here and later in this decision that any error was harmless beyond a reasonable doubt, we are not holding that the alleged prosecutorial misconduct was unusually serious. Rather, because any error satisfies the higher of the two standards, we need not determine how serious the alleged misconduct was.

that objective evidence was presented to the grand jury, that Jackson was "on the run" when the grand jury convened, and that Jackson could have chosen to testify before the grand jury. Defense counsel objected, and the district court sustained the objection. Following a bench conference and direction from the court, the prosecutor stated that Jackson had "no obligation to contribute" at the grand jury proceeding.

The prosecutor has the right to fairly meet the arguments of the defendant. *See State v. Simion*, 745 N.W.2d 830, 844 (Minn.2008) (noting that a prosecutor has the right to argue that a particular defense lacks merit); *State v. Hjerstrom*, 287 N.W.2d 625, 628 (Minn.1979) (holding that the State is permitted to introduce evidence that defendant refused to speak to police after defense counsel attempted to create the impression that police "had not shown any real interest in getting defendant's version of the events"). The prosecutor's argument that Jackson could have chosen to testify before the grand jury may have crossed the line. But Martin has failed to establish prejudice under a harmless-error analysis. This was a brief comment by the prosecutor directed at Martin's codefendant in a 75–page closing argument. Any potential misconduct was mitigated by the bench conference and the subsequent correction made by the prosecutor. Further, the evidence of Martin's guilt was strong. *See Pendleton*, 706 N.W.2d at 509 (holding that a prosecutor's improper question was harmless because a curative instruction was given and the fairness of the trial was not impaired). Thus, any potential misconduct was harmless beyond a reasonable doubt.

Also, Martin argues that the prosecutor impermissibly vouched for witnesses during closing argument. Prosecu-

torial misconduct occurs "when the [prosecutor] implies a guarantee of a witness's truthfulness, refers to facts outside the record, or expresses a personal opinion as to a witness's credibility." *State v. Patterson*, 577 N.W.2d 494, 497 (Minn.1998) (quoting *United States v. Beasley*, 102 F.3d 1440, 1449 (8th Cir.1996)). Further "testimony relating to the existence, the terms, including any truthfulness provision, and the witness's understanding of the plea agreement between the witness and the state, without more, does not constitute vouching." *Patterson*, 577 N.W.2d at 498. While a prosecutor must not personally endorse a witness's credibility, the State may, in closing argument, argue that a witness was or was not credible. *State v. Jackson*, 714 N.W.2d 681, 696 (Minn. 2006).

Many of the witnesses who testified had criminal charges pending in federal court and agreed to testify in order to possibly reduce their sentences. The prosecutor outlined for the jury the procedures for sentencing consideration in federal court for defendants who cooperate in other prosecutions. He also stated that "checks and balances" were in place to ensure that cooperating defendants "better tell the truth" or they would lose their plea bargain. Martin's objection to this argument was overruled. The prosecutor's argument was a fair comment and therefore was not misconduct.

The prosecutor stated: "if you don't tell the truth, you are screwed, lewd and tattooed." The prosecutor then stated: "Fortunately at a prior hearing [the witness] decided to do the right thing[,]" and "If I can turn a kid away from taking it out on the street and killing. . . ." Martin objected to these statements, and the objections were sustained. We conclude that although the first statement was vulgar, none of these statements constituted

vouching for the witness's credibility. Instead, the statements were inartful attempts to argue that witnesses were credible. Moreover, the jury was instructed to disregard the statements. Thus, any possible misconduct by the prosecutor was harmless. *See Pendleton,* 706 N.W.2d at 509.

■■■ Martin claims that the prosecutor inflamed the jurors' prejudices. Specifically, the prosecutor stated: "Welcome to the real world of gangs and gang violence. This is what happens on the streets of North Minneapolis." Martin argues that these statements "implied to the jury that African–American people in north Minneapolis live differently or are a different breed with different values and lifestyles." The State argues that the prosecutor was attempting to explain testimony from witnesses who might not be particularly likeable to most jurors and not attempting to inflame the prejudices of the jury.

"[W]e have repeatedly emphasized that it is improper for the state to highlight a defendant's racial or socioeconomic status as a way to put evidence in context." *State v. Dobbins,* 725 N.W.2d 492, 512 (Minn.2006) (citing *State v. Ray,* 659 N.W.2d 736, 746 (Minn.2003)). In cases where misconduct was found, the prosecutors specifically referred to the defendants by race. *See Ray,* 659 N.W.2d at 746–47. We have held in several cases, however, that referring to the "real world" of north Minneapolis is not misconduct when it is used to prepare the jury for evidence from an unfamiliar world. *See Wren,* 738 N.W.2d at 392 (holding that a prosecutor's references to north Minneapolis are not improper when designed to prepare the jurors for an unfamiliar world of drugs and violence); *State v. Paul,* 716 N.W.2d 329, 340–41 (Minn.2006) (holding prosecutor's argument that murder took place in "real world" where witnesses were not perfect,

without mentioning race and culture and where remarks were brief and not demeaning, was not plain error); *Jackson,* 714 N.W.2d at 695 (holding prosecutor's references to "gang world" proper where designed to introduce jurors to unfamiliar behaviors and mores of gang culture).

We conclude that the prosecutor's argument did not rise to the level of misconduct. The prosecutor did not refer to any party or witness by race. The majority of the prosecutor's witnesses were gang members who had criminal records. The prosecutor was not demeaning, did not go on at length about the "gang world," and did not invite the jury to compare its own world to the world described. On this record, it was not misconduct for the prosecutor to comment about "the real world of gangs and gang violence."

■■■ Martin next argues that the prosecutor inflamed the jurors' prejudices by stating that two of the State's witnesses were not college educated but were from north Minneapolis. But the prosecutor's argument responded to the defense's suggestions that these witnesses' testimony should not be trusted, in part, because, they could not recall precise details of every moment of the shooting. In essence, the prosecutor argued that the witnesses were not college-educated police officers or witnesses trained to record facts and details, but rather, they were ordinary people. On this record, we conclude that the prosecutor's argument did not constitute misconduct.

■■■ Martin also argues that the prosecutor improperly commented on his decision not to testify. It is misconduct for a prosecutor to comment on a defendant's choosing not to testify. *See Ramey,* 721 N.W.2d at 302–03 (citing *Chapman v. California,* 386 U.S. 18, 24–25, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). In cases

where a prosecutor does make impermissible comments, the burden is on the prosecution to prove they were not prejudicial. *Id.* at 303.

During closing argument, Jackson's attorney argued that the prosecutor failed to call certain witnesses and failed to introduce Jackson's statement to the police. In response, the prosecutor stated if he did not have the opportunity at trial to cross-examine Jackson, the jury "wouldn't have the opportunity to realize what a bunch bold face lies he told the police." Because Jackson chose to testify, we conclude that the prosecutor's statement was not a comment on Jackson exercising his right not to testify. Under the circumstances, we see no prosecutorial misconduct.

Finally, Martin argues that the prosecutor disparaged his defense. A prosecutor may argue that there is no merit to a particular defense but may not belittle the defense, either in the abstract or by suggesting that the defense was raised because it was the only defense that might succeed. *State v. Griese,* 565 N.W.2d 419, 428 (Minn.1997) (citation omitted). Martin presents, in a summary fashion, several instances of this type of alleged misconduct.[13] In previous cases, we have addressed claims of alleged prosecutorial misconduct that are virtually identical to Martin's claims, yet he has not cited any of these cases in his brief. We have reviewed the prosecutor's comments, and we conclude that none of them constitutes prosecutorial misconduct. *See, e.g., Simion,* 745 N.W.2d at 844 (holding it was not misconduct for a prosecutor to argue in closing argument that the defendant was trying to "dirty up" the victim during trial); *State v. Atkins,* 543 N.W.2d 642, 648 (Minn.1996) (holding the prosecutor's statement that it would be an "unspeakable injustice" to convict the defendant of a lesser-included offense was not misconduct).

## V.

Martin argues that the State did not sufficiently prove that the murder was committed "for the benefit of a gang," and therefore his conviction for crime committed for the benefit of a gang should be overturned.[14] The State argues that this claim is moot.

Martin was convicted of and sentenced for first-degree murder. Judgment of conviction was not entered for the crime committed for the benefit of a gang, nor was Martin sentenced for this offense. Because he was not convicted of or sentenced for the crime committed for the benefit of a gang, the issue of whether there was sufficient evidence to convict him on that count is moot. *See State v. Swanson,* 707

---

13. Martin also claims that the prosecutor committed misconduct by stating during closing argument that (1) a conviction of only the lesser-included offenses would cause an "unspeakable injustice" and that the jurors should not be tempted "to compromise on justice" by convicting of a lesser offense; (2) Mack–Lynch's pending murder charges had been introduced by the defendant "to smear his character in your eyes"; and (3) he was personally offended by some of defense counsel's arguments.

14. Martin also argues that because the gang-related testimony was so omnipresent at trial, it must have had a strong effect in the jury's deliberations on both counts. As a result, he asks this court to overturn his first-degree murder conviction. We disagree. Martin is not arguing that the gang-related testimony was improperly admitted at trial. And there was overwhelming evidence of Martin's guilt of first-degree premeditated murder, including eyewitness testimony from Mack–Lynch and Pettis, which was corroborated by the testimony of several neighbors, and Martin's admission to others that he shot Lynch.

N.W.2d 645, 659 n. 4 (Minn.2006) ("Because sufficient evidence exists to uphold Swanson's kidnapping conviction, we need not address Swanson's claim that, because there is insufficient evidence supporting his kidnapping conviction, he is entitled to a new trial due to insufficient evidence for one of the alternative felonies underlying his conviction for first-degree felony murder."); *see also Commonwealth v. Candelario*, 446 Mass. 847, 848 N.E.2d 769, 778 (2006) (holding that the issue of the sufficiency of evidence to support theory of murder with extreme atrocity or cruelty was moot where there was no dispute that evidence was sufficient to support alternative theory of deliberate, premeditated murder). We therefore conclude that this issue is moot.

## VI.

■ We turn next to Martin's pro se arguments. Martin argues that the district court erred in refusing to play audio and video evidence of the scene because the police officer who made the tape was not available to testify. Martin claims that the video would have shown that a key eyewitness could not have seen what he claimed to have seen from where he claimed he was standing. For reasons that are not entirely clear, the district court did not admit the video into evidence. But the videotape was largely redundant because photographs already admitted showed the same scenes the video would have shown. In fact, Martin was still able to argue that the eyewitnesses could not have seen what they claimed to see based on the photographs. Thus, on the record before us, we conclude that the failure to admit the video evidence was harmless.

■ Martin next argues that he was denied effective assistance of counsel during trial. Martin claims that his counsel should have investigated the State's "key" witness (and discovered that the witness committed perjury during trial) and should have made more objections during trial. He does not specify what objections should have been made. To prevail on a claim of ineffective assistance of counsel, a defendant "must affirmatively prove that his counsel's representation 'fell below an objective standard of reasonableness' and 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Gates v. State*, 398 N.W.2d 558, 561 (Minn.1987) (quoting *Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Martin has not done so here. Furthermore, Martin's counsel did attempt to discredit the "key" witness in her cross-examination. Martin's argument therefore is without merit.

■ Martin also argues that there were discovery violations. While testifying, Sergeant Dunlap referred to some notes she had taken that did not make it into the official report about which she was being questioned. Defense counsel objected to this testimony and the introduction of those notes, as they had not received them during discovery. The prosecutor agreed to provide defense counsel with the notes once he received them from Dunlap. The notes only corrected a mistake in Dunlap's formal report. Defense counsel did have an opportunity to investigate both Dunlap and the person (Paris Patton) she was interviewing, as well as to cross-examine both of them at trial. Therefore, if there were any discovery violations here, they were harmless. *See Greenleaf*, 591 N.W.2d at 506 (holding that a discovery violation was harmless where the evidence was "not of great importance" and the other evidence weighed strongly against defendant).

Martin argues that the district court erred in allowing Charles Pettis to testify after he heard some testimony from another witness. Pettis admitted to having entered the courtroom while another witness, Mack–Lynch, was testifying, in violation of the district court's sequestration order. The district court questioned him, and he stated that he had heard Mack–Lynch being questioned about who called the police. The district court held that it would allow Pettis to testify and that the defense could use the sequestration violation for impeachment. Martin has not, however, demonstrated any prejudice. *State v. Erdman*, 383 N.W.2d 331, 334 (Minn.App. 1986) (refusing to overturn a conviction where defendant showed only a possible sequestration violation and no prejudice).

Affirmed.

PAGE, Justice (dissenting).

I respectfully dissent. The court concludes that Juror 43 was justifiably stricken on a race-neutral basis because he believed that the criminal justice system was unfair to African Americans. *See Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Specifically, the court notes that the district court did not feel that Juror 43 was "forthcoming" because he could not provide evidence to support his belief that the system was unfair. I conclude that when the views expressed by a prospective juror during voir dire are consistent with what this court has found in *its own review of whether* African Americans are treated unfairly in our judicial system, those views cannot constitute a legitimate non-discriminatory reason that would support the juror's exclusion.

Juror 43 was African American. We have recognized that minority citizens perceive that the court system is biased against them. Minnesota Supreme Court Task Force on Racial Bias in the Judicial System, Final Report S–18 (May 1993). The perception is also shared by professionals in the court. *Id.* More than 75% of the attorneys, judges, and probation officers that responded to the study's survey felt that bias against people of color exists in the court system. *Id.* Nearly 90% said bias is subtle and hard to detect. *Id.* Further, the study found that people of color often choose not to go to trial because of the perception that they will not receive a fair trial and that people of color do have significantly higher incarceration rates. *Id.* at S–15, 18. While the task force report was issued in 1993, there is no evidence that the facts or the perceptions identified in the report have changed dramatically since that time.

I also note that in reaching the conclusion that the strike of Juror 43 was race-neutral, the court ignores the fact that all prospective jurors who expressed concern about the justice system's fairness were not treated equally. Juror 14, a white woman, initially responded to the question on the Juror Questionnaire that asked if she had "any *specific* concerns or complaints about the criminal justice system as it relates to its treatment of persons of color" by indicating, "Yes." At some point, Juror 14 crossed out the "Yes" response, changed her answer to "No," and wrote, "I do not have any *specific* concerns, but I do think it is biased against people of color." Juror 14 was seated and served on the jury. Despite this fact, the court concludes that the exclusion of Juror 43 was proper.

The court also asserts that Juror 43 was eliminated on a race-neutral basis because he worked with the victim's uncle. But this limited contact, if anything, would favor the State, and therefore I question why the prosecutor objected. Further, the victim's aunt notified the court that she

may have worked with Juror 64. When questioned, Juror 64 stated that she had worked at the same place two years earlier and that there was a possibility that she would be transferred there again. The prosecutor did not object, and Juror 64 served on the jury panel.

In *State v. McRae*, 494 N.W.2d 252, 257 (Minn.1992), we held that it was improper to strike a prospective African–American juror because of concerns that the juror might overcompensate and sympathize with the African–American defendant. Specifically, we stated:

> *Batson* expressly forbids this type of reasoning to enter into the jury selection process. "[T]he prosecutor may not rebut the defendant's prima facie case of discrimination by stating merely that he challenged jurors of the defendant's race on the assumption—or his intuitive judgment—that they would be partial to the defendant because of their shared race."

*Id.* (quoting *Batson v. Kentucky*, 476 U.S. 79, 97, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986)).

As I read the record here, Juror 43 was stricken for precisely that reason. Because the State has not shown a race-neutral basis for excluding Juror 43, the district court erred when it concluded that Martin did not meet his burden to prove that Juror 43 was stricken on the basis of intentional discrimination. Such errors are not subject to review for harmless error. *State v. Reiners*, 664 N.W.2d 826, 835 (Minn.2003). Therefore, I would reverse Martin's conviction and remand for a new trial.

ANDERSON, Paul H., Justice (dissenting).

I join in the dissent of Justice Page.