STATE of Minnesota, Respondent,

v.

Charden GOMEZ, Appellant.

No. A03–1075.

Supreme Court of Minnesota.

Sept. 28, 2006.

John M. Stuart, State Public Defender, Ann McCaughan Assistant State Public Defender, Office of the State Public Defender Minneapolis, MN, for Appellant.

Mike Hatch, Attorney General, St. Paul, MN, Amy Klobuchar, Hennepin County Attorney, Patrick C. Diamond, Sr. Assistant County Attorney, Minneapolis, MN, for Respondent.

## ORDER

Following a remand to the district court for correction of the record, on March 10, 2006, this court granted both the state's petition and Gomez's cross-petition for reconsideration of the opinions filed October 13, 2005.

Based upon all the files, records and proceedings herein,

IT IS HEREBY ORDERED that the opinions filed October 13, 2005 be, and the same are, withdrawn and the opinion filed herewith is substituted in their place.

BY THE COURT:

/s/Alan C. Page

Associate Justice

PAGE, Justice.

## OPINION

A Hennepin County grand jury indicted appellant Charden Gomez for the March 17, 2001, murders of Abel and Esther Hillman at their home in Minneapolis. Following a trial, the jury acquitted Gomez of two counts of first-degree premeditated murder but convicted him of the remaining 12 counts, including two counts of first-degree intentional murder during the commission of a burglary.[1] Minn.Stat. § 609.185(3) (2000). The district court sentenced Gomez to two consecutive life terms, one for each victim.

Gomez appealed, arguing that his convictions must be reversed because the trial court: (1) improperly admitted other-crimes evidence; (2) gave the jury a no-adverse-inference instruction with respect to his right not to testify without making a record of his consent to give the instruction; and (3) overruled *Batson* challenges to the state's peremptory strikes of two non-Caucasian jurors and allowed the strike of another non-Caucasian juror. In an opinion that we have now ordered withdrawn, we reversed and remanded for a new trial on the *Batson* issue but on a different ground. We held in part III of that opinion that the district court erred by initiating a peremptory strike of venireperson A.A.,[2] eliciting defense counsel's

---

1. The jury also found Gomez guilty of two counts of second-degree intentional murder and eight counts of second-degree unintentional felony murder involving as predicate offenses various forms of burglary and aggravated robbery.

2. In our original opinion, now withdrawn, we referred to venireperson A.A. as venireperson

*Batson* challenge, and giving reasons justifying the strike before the state actually struck A.A.

We subsequently granted the state's motion for an extension of time to file a petition for rehearing and remanded to the district court to consider the state's request for correction or modification of the record. Following a hearing, the district court corrected the record. The state then filed a petition for rehearing, arguing that the corrected record does not support part III of this court's decision. Gomez opposed the petition and alternatively cross-petitioned for review on the issue of whether the state's peremptory strikes of the three venirepersons were based on race. We granted both the state's petition and Gomez's cross-petition.

At the time of their deaths, the Hillmans were both 89 years old, had been married to each other for 60 years, and had lived for the previous 52 years in the house where they were murdered. The Hillmans had one child, Larry Hillman. Larry had three children, only one of whom, Lori Williamson, lived in Minnesota. Williamson was a crack addict and a prostitute. The Hillmans would, from time to time, give money to Larry's children. Because of Williamson's crack addiction, they would occasionally give her small amounts of cash, buy her groceries and bus passes, or pay her rent, but they would not give her large sums of money.

Sometime in early 2001, Williamson met Gomez, who had recently been released from prison. At some point, Williamson introduced Gomez to her grandparents as her landlord and, on at least two occasions, Esther Hillman wrote checks collectively totaling $625 payable to Gomez for Williamson's rent. In fact, Gomez was not Williamson's landlord. Nonetheless, Gomez cashed the checks and gave the proceeds to Williamson, who used the money to purchase drugs.

On March 16, 2001, Williamson drove Esther Hillman to the bank, where she bought two certificates of deposit, one in the amount of $100,000 payable on death to her son Larry and the other in the amount of $25,000 payable on death to Williamson. After their trip to the bank, Williamson dropped Esther Hillman off at home, called several friends, and bragged about money she was going to be receiving from the Hillmans. When Williamson told her sister Lisa that the Hillmans were giving her a large sum of money in the form of a certificate of deposit, Lisa explained that the only way Williamson could collect the proceeds from the certificate of deposit was if the Hillmans died.

Lisa Hillman talked with Esther Hillman on the evening of Friday, March 16. The following morning, at approximately 6:34 a.m., a 911 call was placed from the Hillmans' home. When the operator answered the call, no one was on the line. Police officers, following up on the 911 call, went to the Hillmans' home. They found a newspaper laying on the sidewalk, the front door locked, all the lights off, and the shades pulled down. After ringing the doorbell and getting no answer, they left.

When Lisa was unable to reach the Hillmans on Sunday, March 18, she called her father and asked him to check on them. When he arrived at his parents' home, Larry Hillman found that a light in the bedroom window was on and the front door was unlocked. Upon entering, he discovered his parents' bodies. Autopsies revealed that Abel Hillman died of blunt force injuries to his head and that Esther Hillman had been stabbed more than 70

times, four of which could have been fatal in and of themselves.

After further investigation linked Gomez to the crime, he was arrested, indicted for, and ultimately convicted of the Hillmans' murders.

## I.

■ First, we consider whether the trial court improperly admitted evidence of previous crimes committed by Gomez. We review a trial court's decision to admit evidence of other crimes for an abuse of discretion. *State v. Blom*, 682 N.W.2d 578, 611 (Minn.2004) (citing *State v. Kennedy*, 585 N.W.2d 385, 389 (Minn.1998)). Evidence of past crimes, frequently referred to as *Spreigl* evidence, is generally not admissible to prove the defendant's character for committing crimes, but can be admitted to show motive, intent, absence of mistake, identity, or a common scheme or plan. Minn. R. Evid. 404(b); *State v. Spreigl*, 272 Minn. 488, 139 N.W.2d 167 (1965). *Spreigl* evidence can be admitted only if:

> (1) notice is given that the state intends to use the evidence; (2) the state clearly indicates what the evidence is being offered to prove; (3) the evidence is clear and convincing that the defendant participated in the other offense; (4) the *Spreigl* evidence is relevant and material to the state's case; and (5) the probative value of the *Spreigl* evidence is not outweighed by its potential for unfair prejudice.

*Kennedy*, 585 N.W.2d at 389. If it is unclear whether *Spreigl* evidence is admissible, the benefit of the doubt should be given to the defendant and the evidence should be excluded. *Id.*

■ To prove identity, the state successfully sought to admit evidence related to the following four crimes committed by Gomez:

(1) On August 12, 1989, at 4:55 p.m., Gomez forcibly entered into an elderly couple's home. He struck both, knocked one to the ground, demanded money, and fled with their purse and wallet.

(2) On August 12, 1989, at 9:30 p.m., Gomez forcibly entered into another elderly couple's home. He took the man's wallet and struck him in the face, causing him a minor cut.

(3) On August 13, 1989, at 1:05 a.m., Gomez broke into the home of a 74–year-old woman, shoved her off the bed, demanded money, and rummaged through her closet and cabinet.

(4) On August 13, 1989, at 2:30 a.m., Gomez broke into an elderly couple's home. When the elderly woman attempted to reach for the phone, he grabbed her and pushed her onto a bed. He fled with a wallet.

Gomez concedes that the first three factors to be considered when determining the admissibility of *Spreigl* evidence were met, but argues nonetheless that the evidence should not have been admitted. He argues that the *Spreigl* evidence is inadmissible because the state's case was not "weak." We have previously held that "[e]vidence of other crimes is admissible only if the trial court finds that the direct or circumstantial evidence of the defendant's *identity* is otherwise *weak* or inadequate, and that the evidence is necessary to support the state's burden of proof." *State v. Billstrom*, 276 Minn. 174, 178–79, 149 N.W.2d 281, 284 (1967) (emphasis added). Here, the trial court found that the state's identity evidence was weak. Specifically, the trial court stated:

> The State has a weak case here in terms of Spriegl [sic] as they've acknowledged in their memo. It's purely circumstan-

tial. They've got a fingerprint with a little DNA from the defendant's car, they got a couple of well-impeached witnesses, and so forth. * * * The case is weak in that sense and the State has a need for this type of evidence * * * [It is] a circumstantial case where the handwriting is a positive identification I think essentially, but can be accounted for in a number of ways, like the DNA, like the fingerprint—all of those things are subject to alternate theories, obviously. What I meant is simply that.

Having reviewed the record, we are satisfied that the trial court's finding is not clearly erroneous.[3]

Gomez also argues that the *Spreigl* evidence was not relevant because the charged offenses and the *Spreigl* offenses are dissimilar. Specifically, he asserts that the Hillman murders were not part of a crime spree, that stabbing the victims multiple times is not the same as hitting or shoving the victims, that he knew the Hillmans but not the previous victims, and that the time of the crimes varied. The state contends that the *Spreigl* evidence was relevant and material because of the similarities of the offenses.

*Spreigl* evidence is relevant and material when there is a sufficiently close relationship between the charged offense and the *Spreigl* offense in terms of time, place, or modus operandi. *Kennedy*, 585 N.W.2d at 390. "[T]he closer the relationship, the greater is the relevance * * *." *State v. Frisinger*, 484 N.W.2d 27, 31 (Minn.1992). *Spreigl* evidence need not be identical in every way to the charged

crime. *Kennedy*, 585 N.W.2d at 391. Here, while the charged offenses and the *Spreigl* offenses are not identical, their relationship is sufficiently close in terms of time and modus operandi. Although there is an 11–year gap between the charged offenses and *Spreigl* offenses, Gomez was incarcerated for the *Spreigl* offenses until approximately six months before the charged offenses. As we noted in *State v. Wermerskirchen*, 497 N.W.2d 235, 242 n. 3 (Minn.1993), the passage of time may be insignificant when the defendant has spent a substantial part of the time between the offenses in prison. Obviously, that is the case here. Thus, the gap in time between the offenses does not weigh against the *Spreigl* offenses' relevance and materiality. We also conclude that there is sufficient similarity between the charged offenses and the *Spreigl* offenses. In three of the *Spreigl* offenses, elderly couples were burglarized or robbed in their homes. In the fourth case, a 74–year–old woman was burglarized in her home. The similarities between the *Spreigl* offenses and the charged offenses are striking. In each case, the victims were elderly, the victims were physically assaulted in their homes, and the victims' wallets or purses were taken or money was demanded. Therefore, we conclude that the *Spreigl* evidence was sufficiently relevant and material.

Gomez further argues that the evidence related to his 1989 offenses should have been excluded because its probative value is substantially outweighed by the danger of unfair prejudice. In *State v. Bolte*, we stated:

> held that "[h]enceforth, courts should address the need for *Spreigl* evidence in the context of balancing the probative value of the evidence against its potential for unfair prejudice." *State v. Ness*, 707 N.W.2d 676, 689, 690 (Minn.2006).

**3.** The parties did not request, and we did not grant, rehearing on the issue of the admissibility of the *Spreigl* evidence. We note, however, that after the original opinion was issued in this case, we decided to "dispense with an independent necessity requirement for the admission of *Spreigl* evidence," and

In determining admissibility, the trial court should engage in a balancing of factors such as the relevance or probative value of the evidence, the *need* for the evidence, and the danger that the evidence will be used by the jury for an improper purpose, or that the evidence will create unfair *prejudice* pursuant to Minn. R. Evid. 403.

530 N.W.2d 191, 197 (Minn.1995) (emphasis added). We further explained:

> "[P]rejudice" does not mean the damage to the opponent's case that results from the legitimate probative force of the evidence, rather it refers to the unfair advantage that results from the capacity of the evidence to persuade by illegitimate means.

*Id.* at 197 n. 3 (citation omitted).

Gomez claims that the trial court concluded that the *Spreigl* evidence was unfairly prejudicial but admitted the evidence anyway. However, the transcript reflects that the court recognized the prejudicial nature of the *Spreigl* evidence and carefully weighed it against the probative value of the evidence. The court decided that the correct application of the law was to admit the evidence of Gomez's other crimes. In doing so, the trial court stated:

> I'll state for the record that * * * there is very little doubt in my mind that this evidence is going to be highly prejudicial and it ought not be received, but the state of the law in Minnesota I think is such that it would be received in most trials, and I've looked at the cases carefully and commentaries on the cases, so what I say is, I say it should not be received is a broader statement in policy, but I say it for the record, were I working on a clean slate here, I would not use it as evidence. It is virtually inconceivable to me that the jury won't, to some extent, conclude that Mr. Gomez has a propensity to rob old people and beat them up, which of course is exactly the reason this evidence is excluded under Rule 404, and it doesn't fit any of the standard exceptions to Rule 404, but it does hit these cases that talk about modus operandi and signature crimes, and so forth.
>
> * * * The courts have repeatedly held, and the State cited in its memo a couple of cases that are relatively similar to the present case, homicide cases where earlier incidents were received, and I don't believe that I can exclude them without simply ignoring these cases, and I don't think it's within my authority to do that, as much as I do disapprove of it. * * *
>
> * * * *
>
> * * * I've looked at [the *Spreigl* evidence] with some care, trying to control the prejudice as best I can. What I propose to do without dictating the precise terms of it, counsel, is to allow you to elicit the fact * * *.
>
> * * * *
>
> I don't want * * * those crimes to overwhelm this case, as they have a chance of doing. I've gone through the usual Spriegl [sic] analysis. Most of the factors are not even clear and convincing, of course, as established by the guilty plea. The similarity is sufficient, of course, and that's why I'm letting them in * * * they're close enough to satisfy any Spriegl [sic] analysis.
>
> The remoteness is satisfied by the fact he was incarcerated.
>
> * * * *
>
> * * * I've given a great deal of thought, and that is where I stand on these issues now. I'll instruct the jury as to the use of this evidence as best I can.

In admitting the evidence, the trial court, after consulting with the state and Gomez's counsel, gave a proper limiting instruction to the jury as to the use of the

other-crimes evidence both at the time the evidence was admitted and as part of the final instructions before jury deliberations.

Although the trial court expressed its personal view that as a matter of policy *Spreigl* evidence of the type admitted here should not be admissible, the trial court correctly ruled that the probative value of the evidence at issue outweighed the potential prejudice. The trial court appropriately instructed the jury to limit the use of such evidence.

In that we have concluded that the evidence of Gomez's past crimes was relevant and material and that the probative value of the evidence outweighed its potential for unfair prejudice, we therefore conclude that the trial court did not abuse its discretion when it admitted the other-crimes evidence.

## II.

We now turn to Gomez's contention that the trial court committed reversible error when it instructed the jury on Gomez's right not to testify without obtaining his consent to give the instruction on the record. Gomez contends that the questionable credibility of two key witnesses made his case a "close factual case" and that the instruction, coupled with the *Spreigl* evidence, "had to have some impact on the verdicts rendered by the jury." We disagree.

 A defendant in a criminal trial has the right to testify, but failure to testify shall not create any presumption against the defendant. Minn.Stat. § 611.11 (2004). If the defendant chooses not to testify, the trial court may instruct the jury not to draw any adverse inference from the fact that the defendant has not testified *only if* the defendant requests the court to do so. 10 Minn. Dist. Judges Ass'n, Minnesota Practice—Jury Instruction Guides, Criminal, CRIMJIG 3.17 (4th

ed. 1999 & Supp.2003–04); *McCollum v. State*, 640 N.W.2d 610, 616 (Minn.2002). If the defendant requests the instruction, the court or the defendant's counsel must make a record of "the defendant's clear consent and insistence that the instruction be given." *McCollum*, 640 N.W.2d at 617. No party may assign as error any portion of the charge or omission from the instructions given unless the party objects to the instructions before the jury retires to consider its verdict. Minn. R.Crim. P. 26.03, subd. 18(c). If no objection is made to the trial court giving the no-adverse-inference instruction, review is for plain error. *State v. Darris*, 648 N.W.2d 232, 240 (Minn.2002). For there to be plain error: (1) there must have been error; (2) the error was plain; and (3) the error must have affected the party's substantial rights. *Id.*

 We have stated that the third prong is satisfied if the error was prejudicial and affected the outcome of the case. *State v. Griller*, 583 N.W.2d 736, 741 (Minn.1998). An error in instructing the jury is prejudicial if there is a reasonable likelihood that giving the instruction in question had a significant effect on the jury verdict. *Id.* We have held that a defendant who fails to object to the no-adverse-inference instruction bears a heavy burden of showing that substantial rights have been affected. *Darris*, 648 N.W.2d at 240 (citation omitted). Giving the no-adverse-inference instruction without consent, absent a showing of prejudice, is harmless. *See id.* If these three prongs are met, the reviewing court then assesses whether it should address the error to ensure the fairness and integrity of the judicial proceedings. *Griller*, 583 N.W.2d at 740 (citing *Johnson v. United States*, 520 U.S. 461, 467, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997)).

■ Gomez did not testify at his trial. Because he did not testify, a question arose as to whether the jury was to be instructed that no adverse inference was to be made based on Gomez's failure to testify. In resolving that question, the following discussion took place:

[DEFENSE COUNSEL]: Judge, do we need to put on the record—my client didn't testify. That's his choice—

THE COURT: Yes.

[DEFENSE COUNSEL]: Do we do that at this time or—

THE COURT: Yes. * * * Also you tell me whether you want an instruction on that.

[DEFENSE COUNSEL]: Judge, if I can think about that overnight I know we'll be able to give you an answer tomorrow.

THE COURT: I can't give the instruction—or at least I won't—

[DEFENSE COUNSEL]: Right.

THE COURT:—without your specific request.

[DEFENSE COUNSEL]: My inclination is not to have you give it, but I would like to just sort of ponder it over the evening.

THE COURT: Yes. It won't be given unless it comes from the defense request.

In the end, a no-adverse-inference instruction was given to the jury without objection, but the record does not indicate that Gomez consented to the instruction. The record does indicate that Gomez's counsel had the opportunity to review the preliminary instructions and seek changes before the instructions were finalized. No changes to the no-adverse-inference instruction were sought nor was any objection made to that instruction. In addition, after the instructions were given to the jury, Gomez's counsel answered "No" when asked by the trial court whether there were "any objections, additions or anything on the instructions." Finally, before the jury returned its verdict, the court asked whether either of the parties would like to put anything on the record. Gomez's counsel also answered "No" to that question.

Here, the trial court gave the no-adverse-inference instruction without placing Gomez's consent to the instruction on the record and Gomez did not make any objection. Thus, our review is for plain error. Because the record does not contain Gomez's consent to the giving of the no-adverse-inference instruction, we conclude that giving the instruction was error and that the error was plain. *See Darris,* 648 N.W.2d at 240. The first and second prongs of the plain error test are satisfied.

■ In this case, the primary issue at trial was the identity of the killer. While there was no direct evidence, the state presented circumstantial evidence, including a partial DNA profile, fingerprint identification, handwriting analysis, wiretapped conversation, similar crimes committed by Gomez, and testimony of other witnesses. We have concluded above that evidence of Gomez's prior crimes was relevant to prove identity and the probative value of the evidence is not outweighed by its potential for unfair prejudice. Moreover, the record shows that the state's key witnesses, including Lori Williamson, were subject to extensive cross-examination. The credibility of these witnesses is for the jury to decide. Given the totality of the evidence, it seems unlikely that the jury would have reached a different verdict. We conclude both that Gomez has failed to show that the error was prejudicial and that he has failed to meet his heavy burden of showing that there "is a reasonable likelihood that the giving of the instruction would have had a significant effect on the

jury's verdict." *Darris,* 648 N.W.2d at 240.

Because the third prong of the plain-error test is not satisfied, we need not consider the effect of the error on the fairness and integrity of the trial. We note, however, that the trial court stated, on the record, its intent not to give the instruction without Gomez's consent and that the defense counsel had the opportunity to review the instruction and seek changes to it but did not. Thus, although we need not decide this issue, the record suggests that Gomez acquiesced in the instruction being given.

In summary, because the error in giving the instruction did not significantly affect the jury's verdict, we conclude that Gomez is not entitled to a new trial based on that error.

### III.

Finally, we address the parties' various contentions regarding the state's peremptory strikes of three non-Caucasian venirepersons, the corrected record relating to the strike of venireperson A.A., and our authority to rehear this appeal.

### A.

■ We must first address Gomez's argument that the court was divested of jurisdiction to rehear this appeal because we improperly granted the state's untimely motion for an extension of time to file a rehearing petition. Minnesota Rule of Civil Appellate Procedure 140.01 provides that a petition for rehearing is due to be filed within 10 days after the filing of an opinion unless the court enlarges the time "within the 10–day period." However, the rule governing enlargement of time states that an appellate court "may permit an act to be done after the expiration of [the time prescribed by the appellate rules] if the failure to act was excusable under the

circumstances." Minn. R. Civ.App. P. 126.02. Our order granting the extension motion was based on the determination that the state's failure to seek an extension of time within the 10–day limit prescribed by Rule 140.01 was excusable under the circumstances. The state had no occasion to attempt to correct the record before our earlier opinion was released, the state acted promptly to obtain the backup audiotape, and it filed the extension motion two days after receipt of the audiotape.

We do not agree with Gomez's contention that we were divested of jurisdiction under another provision of Rule 126.02, which prohibits an appellate court from extending "the time for filing the notice of appeal or * * * for securing review of a decision or an order of a court or an administrative agency, board, commission or officer, except as specifically authorized by law." A petition for a rehearing or reconsideration of this court's own decision differs in kind from securing appellate review of a decision by a lower court or administrative entity.

### B.

■ Gomez next argues that the district court on remand clearly erred in its findings of fact regarding what occurred during the voir dire of venireperson A.A. The state contends that the district court's findings are well supported by the record and by its credibility determinations.

The district court judge who presided at the hearing on remand found that the trial transcript of the voir dire of A.A. is inaccurate in several respects. Most important, the judge found that the following took place, none of which appeared in the original transcript. First, after the defense accepted A.A. as a juror, there was a bench conference at which the prosecutor stated he would interpose a peremptory

strike and articulated reasons for it that he later placed on the record. Second, in overruling the *Batson* challenge, the trial court determined there was a "valid racially neutral reason" for the peremptory strike.

We have summarized the standards for reviewing the district court's factual findings as follows:

> It is not the province of this court to reconcile conflicting evidence. On appeal, a trial court's findings of fact are given great deference, and shall not be set aside unless clearly erroneous. Findings of fact are clearly erroneous only if the reviewing court is "left with the definite and firm conviction that a mistake has been made." If there is reasonable evidence to support the trial court's findings of fact, a reviewing court should not disturb those findings.

*Fletcher v. St. Paul Pioneer Press*, 589 N.W.2d 96, 101 (Minn.1999) (citations omitted).

We have carefully reviewed the trial transcript, the backup audiotape, and the testimony and other evidence presented at the remand hearing. We conclude that the findings of the district court judge on remand are clearly supported by reasonable evidence, and hence we will not disturb them. We also concur with the remand judge's conclusions that the prosecutor initiated the peremptory strike at the bench conference and that the trial judge neither initiated the strike nor articulated reasons for it before the prosecutor did so.

## C.

Last, we consider Gomez's contention that the state's peremptory strikes of three non-Caucasian members of the jury

venire were motivated by race discrimination. During voir dire, the state exercised peremptory strikes against three venirepersons, A.A. and G.C., both African Americans, and M.P.H.,[4] an Asian American. Gomez raised *Batson* challenges to the strikes of A.A. and G.C., but not to the strike of M.P.H.

The Equal Protection Clause of the Fourteenth Amendment prohibits purposeful race discrimination in jury selection. *Batson v. Kentucky*, 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Under the *Batson* three-step analysis, (1) the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race; (2) the burden then shifts to the prosecution to articulate a race-neutral explanation for striking the jurors in question; and (3) the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Hernandez v. New York*, 500 U.S. 352, 358–59, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991); *see* Minn. R.Crim. P. 26.02, subd. 6a(3). Step one focuses on "(1) whether one or more members of a racial group have been peremptorily challenged and (2) whether the circumstances of the case raise an inference that the challenge was based on race." *State v. White*, 684 N.W.2d 500, 506 (Minn.2004). Under step two, the issue is the facial validity of the prosecutor's explanation, which need not be persuasive or even plausible; unless discriminatory intent is inherent in the explanation, the reason offered is deemed race-neutral. *Purkett v. Elem*, 514 U.S. 765, 767–68, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). The defendant ultimately carries the burden of persuasion to demonstrate the existence of purposeful discrimi-

---

**4.** In our original opinion, now withdrawn, we referred to venireperson G.C. as venireperson 12 and venireperson M.P.H. as venireperson 9.

nation; this burden never shifts from the opponent of the strike. *Johnson v. California*, 545 U.S. 162, ——, 125 S.Ct. 2410, 2417, 162 L.Ed.2d 129 (2005). Because the existence of racial discrimination in the exercise of a peremptory strike is a factual determination, we give great deference to the trial court's ruling and will not reverse unless it is clearly erroneous. *State v. Reiners*, 664 N.W.2d 826, 830–31 (Minn. 2003).

### 1. Venireperson A.A.

 On being questioned by defense counsel during voir dire, A.A. revealed that her father had been tried for and convicted of sexually abusing her half-sister about 15 years earlier, when A.A. was a young child. A.A. testified at her father's trial, and upon his release from prison her father returned to live with the family. A.A. testified that she thought her father was wrongly convicted because there was insufficient evidence but did not recall any bias against her father at the trial. The prosecutor exercised a peremptory strike of A.A. without questioning her. In response to Gomez's *Batson* challenge, the prosecutor stated that the strike was for

> the obvious reason [that A.A.] had a tragic circumstance occur in her life at a very young age, and as she described for us, came into court and testified for the defense on behalf of her father. Her father was nevertheless convicted and she also described for us how * * * her family went to some length it sounds like to me to look at the evidence and still [sic] convinced that the evidence certainly didn't justify having her father in prison, and then once he came out of prison, the father came back to live in the household with she [sic] and a younger sister. * * * It's just a situation that is untenable.

The trial court ruled that there was a valid racially neutral reason for the strike, stating that "if the race of the juror is left out of it, it would be bordering on ineffective representation not to challenge her because of that."

Gomez makes three arguments in support of his claim that the peremptory strike was racially motivated. First, he contends that the prosecutor exaggerated by stating that A.A. described her family having gone to some length to examine the evidence of her father's guilt. If this statement can be characterized as an exaggeration, it was not an exaggeration of A.A.'s belief that her father was wrongly convicted, the reason for the strike.

Second, Gomez contends that in her testimony A.A. expressed only a past, not a present, belief that her father had been wrongly convicted. Gomez did not make this argument in support of his *Batson* challenge at trial. We are satisfied that A.A.'s testimony reasonably can be read to mean a present belief. We have "consistently held that a family member's involvement with the legal system is a legitimate race-neutral reason for the state to exercise a peremptory challenge." *Reiners*, 664 N.W.2d at 832 (citing cases). In particular, we have held that the fact that a prospective juror's father has been convicted of a serious felony was a sufficient nonrace-based justification for a peremptory strike. *State v. Martin*, 614 N.W.2d 214, 222 (Minn.2000).

Gomez's third contention is that the state did not strike other jurors who expressed views similar to those of A.A. Five seated jurors had relatives or acquaintances who committed crimes or were victims of crime. But none of them testified in the earlier case or expressed the view that a relative had been wrongly convicted. Additionally, one of these five jurors is African American, so any similari-

ty in answers does not reveal a race-based reason for striking A.A.

We conclude that the trial court did not err in determining that the peremptory strike of A.A. was based on a valid race-neutral reason.

### 2. Venireperson G.C.

 The prosecutor exercised a peremptory strike of G.C. based on (1) G.C.'s expressed discomfort at deciding whether "to put someone away" and deciding another person's future and (2) his changed view of police testimony since serving on a jury several years earlier. The district court overruled Gomez's *Batson* challenge and allowed the strike.

 Both reasons given by the prosecutor are facially race-neutral, and Gomez does not argue otherwise. *See State v. Gaitan,* 536 N.W.2d 11, 16 (Minn.1995) (prospective juror stricken because of expressed reluctance to sit in judgment of others); *Angus v. State,* 695 N.W.2d 109, 117 (Minn.2005) (venireperson stricken because he might favor police testimony). Gomez's principal claim is instead based on comparative juror analysis, namely that the state did not strike other jurors with views similar to those of G.C.[5] Purposeful race discrimination can be shown by evidence that the prosecutor's proffered race-neutral reason for striking an African–American venireperson applies equally to an otherwise-similar non-African American who is permitted to serve on the jury. *Miller–El v. Dretke,* 545 U.S. 231, 240, 125 S.Ct. 2317, 2325, 162 L.Ed.2d 196 (2005).

Gomez has failed to demonstrate the existence of purposeful discrimination on the basis of comparative juror analysis.

Of the three seated jurors who expressed reluctance to sit in judgment, one was African American and all three gave qualitatively different answers than G.C., whose reluctance extended to a reluctance to convict. Gomez's suggestion that the prosecutor engaged in disparate questioning on this issue fails as a factual matter; defense counsel was the one who sometimes made this inquiry, as she did with G.C., and it appears that a question on the written juror questionnaire touched on this subject. With respect to seated jurors' views of the police, none expressed a negative view of police testimony, and at least two jurors who were not asked about their views of the police were African Americans.

We conclude that on this record the trial court did not err in allowing the state's peremptory strike of G.C. In order to reinforce what we said in *Reiners,* however, we say again that the trial court has a duty under *Batson's* third prong to "state fully its factual findings, including any credibility determinations" for its determination of whether there has been purposeful discrimination by the party exercising the peremptory strike. *Reiners,* 664 N.W.2d at 832.

### 3. Venireperson M.P.H.

 Gomez did not object to the prosecutor's peremptory strike of M.P.H. during voir dire and did not raise a *Batson* challenge to the strike until appeal. We hold that the challenge is untimely.

 Minnesota Rule of Criminal Procedure 26.02, subd. 6a(2), requires a *Batson* challenge to be made, and the district court to rule on the challenge, "before the jury is sworn to try the case." Additional-

---

5. We find no merit to Gomez's other claim, that the prosecutor impermissibly exaggerat-

ed the second reason for the strike.

ly, we have held that a challenge to a jury panel based on a constitutional violation must be made before the jury is sworn, and absent fraud or collusion, such an objection made subsequent to the verdict is untimely. *State v. Arradondo,* 260 Minn. 512, 518, 110 N.W.2d 469, 473 (1961). A timely *Batson* challenge "allows the trial court to remedy the discrimination prior to the commencement of trial." *United States v. Parham,* 16 F.3d 844, 847 (8th Cir.1994). To the extent Gomez might be contending the trial court should have raised a *Batson* challenge on its own initiative, *see* Minn. R.Crim. P. 26.02, subd. 6a(2), we see nothing in the record to suggest that the trial court erred by not doing so.

In summary, we hold that the trial court did not clearly err in allowing the peremptory strikes of A.A., G.C. or M.P.H.

Affirmed.

ANDERSON, G. BARRY, J., took no part in the consideration or decision of this case.

GILDEA, J., took no part in the consideration or decision of this case.