*This opinion is nonprecedential except as provided by Minn. R. Civ. App. P. 136.01, subd. 1(c).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A23-0842**

State of Minnesota,
Respondent,

vs.

Camille Lashay Dennis-Bond,
Appellant.

**Filed April 29, 2024
Affirmed
Cochran, Judge**

Dakota County District Court
File No. 19HA-CR-21-2353

Keith Ellison, Attorney General, St. Paul, Minnesota; and

Kathryn M. Keena, Dakota County Attorney, Heather Pipenhagen, Assistant County Attorney, Hastings, Minnesota (for respondent)

Travis M. Keil, Chanhassen, Minnesota (for appellant)

Considered and decided by Cochran, Presiding Judge; Johnson, Judge; and Cleary, Judge.*

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

**NONPRECEDENTIAL OPINION**

**COCHRAN**, Judge

In this direct appeal from a judgment of conviction for third-degree murder, criminal vehicular homicide, criminal vehicular operation, and careless driving, appellant argues that she is entitled to a new trial because the district court erred when it rejected her *Batson* challenge. In the alternative, appellant argues that her convictions of third-degree murder, criminal vehicular homicide, and criminal vehicular operation should be reversed because the evidence at trial was insufficient. Appellant also argues that the district court abused its discretion by denying her motion for a downward dispositional or durational departure. We affirm.

**FACTS**

The following facts summarize the evidence received during the jury trial, viewed in the light most favorable to the jury's verdict. On the morning of Sunday, April 4, 2021, appellant Camille Lashay Dennis-Bond was driving to church in her black Chevy Malibu on eastbound County Road 42 near the cities of Burnsville and Savage. Dennis-Bond's brother, L.B., was also driving to church at the same time and from the same location as Dennis-Bond. He drove separately in a white Chrysler. Dennis-Bond had a friend riding in the passenger seat of her car. Dennis-Bond's sister, C.M.B., was riding in the passenger seat of L.B.'s car.

According to Dennis-Bond's passenger, the siblings' cars were driving side-by-side down County Road 42. After stopping at a stop light, Dennis-Bond and L.B. rolled down their windows. As the cars idled, the siblings talked about "who could accelerate faster

from the stoplight." When the light turned green, the cars rapidly accelerated down the road. Several other drivers saw the two cars race down County Road 42 at what were described as "horrific" speeds.

As the siblings proceeded eastbound, L.B.'s Chrysler collided with a red Honda CRV that was turning across County Road 42 at an intersection. The force of the collision flipped the CRV and split the car in half. Dennis-Bond avoided the collision and pulled to the side of the road, where she exited her vehicle and ran over to the scene of the accident. Dennis-Bond was heard saying that she hoped the driver of the CRV was dead.

The driver of the CRV and his passenger died immediately at the scene of the crash. C.M.B. also suffered serious injuries. Dennis-Bond was arrested at the scene.

A crash-reconstruction specialist with the Minnesota State Patrol (the sergeant) obtained data from the "air-bag control module" in L.B.'s car, which provided "a short window of pre-crash information." Using surveillance video from a nearby business and applying "energy and momentum equations" to the data from L.B.'s car, the sergeant determined that L.B. was travelling between 99 and 112 miles per hour at the time of the collision. And based on the surveillance footage, the sergeant concluded that Dennis-Bond's car was travelling between 91 and 107 miles per hour just before the crash. The speed limit on County Road 42 at the scene of the crash was 50 miles per hour. Based on his experience, the sergeant opined that Dennis-Bond and L.B. were racing.

The sergeant also determined that the CRV was travelling between 15 and 17 miles per hour when it was struck by L.B.'s car. According to the sergeant, the CRV "would have cleared the intersection significantly" had L.B. and Dennis-Bond been traveling the

3

speed limit. The sergeant determined that L.B.'s speed was the "primary factor" for the crash, and that Dennis-Bond's "comparable speeds with" L.B. was a "secondary factor."

Respondent State of Minnesota filed a complaint in October 2021 charging Dennis-Bond with two counts of third-degree murder and two counts of criminal vehicular homicide for the deaths of the CRV driver and his passenger. *See* Minn. Stat. §§ 609.195(a), .2112, subd. 1(a)(1) (2020). Because of C.M.B.'s serious injuries, the state also charged Dennis-Bond with criminal vehicular operation—for a total of five charges arising from the collision. *See* Minn. Stat. § 609.2113, subd. 1(1) (2020). Dennis-Bond moved to dismiss the charges, arguing that the state lacked probable cause. The district court denied Dennis-Bond's motion and scheduled a trial.

Dennis-Bond's jury trial began on December 5, 2022. During jury selection, the state used a peremptory strike on Prospective Juror 7, who is a person of color. Dennis-Bond challenged the state's peremptory strike, arguing that the strike was based solely on the prospective juror's race. The district court upheld the state's peremptory strike, concluding that there was "not a sufficient basis to find that purposeful discrimination ha[d] been established."

The case proceeded to trial, where several witnesses testified, including uninvolved drivers, first responders, and law-enforcement officers (including the sergeant), as summarized above. Before closing argument, the district court granted Dennis-Bond's motion to include a count of careless driving in the jury instructions as a lesser included offense. The jury found Dennis-Bond guilty on all six counts—the original five counts plus the careless-driving count.

4

Before sentencing, Dennis-Bond moved for a downward dispositional or durational departure. The district court denied Dennis-Bond's motion and imposed concurrent, executed sentences of 150 and 180 months, respectively, on the third-degree-murder convictions and 38 months on the criminal-vehicular-operation conviction.[1] This appeal follows.

**DECISION**

Dennis-Bond makes three arguments on appeal. First, she contends that she is entitled to a new trial because the district court clearly erred by denying her challenge of the state's peremptory strike of a prospective juror of color. Second, Dennis-Bond argues that her convictions for all charges except careless driving should be reversed because the evidence was insufficient for the jury to determine that her conduct caused the collision. Finally, Dennis-Bond asserts that the district court abused its discretion by denying her motion for a downward dispositional or durational departure. We address Dennis-Bond's arguments in turn.

I. **The district court did not clearly err by denying Dennis-Bond's *Batson* challenge.**

Each party to a criminal trial is afforded a limited number of peremptory strikes, which "allow a party to excuse a prospective juror without providing a reason." *State v. Lufkins*, 963 N.W.2d 205, 209 (Minn. 2021); *see also* Minn. R. Crim. P. 26.02, subd. 6. A party may use a peremptory challenge "to strike a prospective juror that the party believes

---

[1] The district court did not impose sentences on Dennis-Bond's two convictions of criminal vehicular homicide or her conviction of careless driving.

5

will be less fair than some others" in an effort "to select as final jurors the persons they believe will be most fair." *State v. Martin*, 773 N.W.2d 89, 100 (Minn. 2009) (quotation omitted). But a party may not use a peremptory challenge to strike a prospective juror based on race, as doing so violates the Equal Protection Clause of the Fourteenth Amendment. U.S. Const. amend. XIV, § 1; *Batson v. Kentucky*, 476 U.S. 79, 84 (1986); *see also State v. Carridine*, 812 N.W.2d 130, 136-37 (applying *Batson*). A party's assertion that a peremptory strike is based on race is referred to as a *Batson* challenge. *See Lufkins*, 963 N.W.2d at 209.

Minnesota courts use a three-step framework set forth by the United States Supreme Court in *Batson* to determine whether a peremptory challenge was motivated by racial discrimination. *Martin*, 773 N.W.2d at 101; *see also* Minn. R. Crim. P. 26.02, subd. 7(3). Under this framework,

> (1) the defendant must make a prima facie showing that the prosecutor executed a peremptory challenge on the basis of race; (2) the burden then shifts to the prosecution to articulate a race-neutral explanation for striking the juror in question; and (3) the district court must determine whether the defendant has carried the burden of proving purposeful discrimination.

*Martin*, 773 N.W.2d at 101. We afford a district court "great deference" in a *Batson* ruling "because the record may not reflect all of the relevant circumstances that the court may consider." *Id.* (quotation omitted). As a result, we will not reverse a district court's ruling on a *Batson* challenge unless it is clearly erroneous. *State v. Pendleton*, 725 N.W.2d 717, 724 (Minn. 2007); *see also State v. Harvey*, 932 N.W.2d 792, 811 (Minn. 2019) (holding

6

that a district court's ruling on a *Batson* challenge is reviewed for clear error unless the district court "makes its determinations using the wrong legal standard").

Dennis-Bond brought a *Batson* challenge after the state struck Prospective Juror 7. Addressing Dennis-Bond's *Batson* challenge, the district court first determined that Dennis-Bond had made a prima facie showing that the peremptory strike was based on race. Next, the district court determined that the state offered a race-neutral explanation for the peremptory strike of Prospective Juror 7 based on his "responses regarding a car accident that he was previously in." Lastly, the district court concluded that Dennis-Bond failed to demonstrate that the strike was motivated by purposeful discrimination, and it denied the *Batson* challenge.

Dennis-Bond argues that the district court erred by denying her *Batson* challenge. Because the district court determined that Dennis-Bond made a prima facie showing of discrimination and proceeded to steps two and three of her *Batson* challenge, we need not address step one. *See Lufkins*, 963 N.W.2d at 210 (holding that "the question as to step one is moot on appeal" when the district court proceeds to steps two and three of a *Batson* analysis). We therefore only consider steps two and three of the district court's *Batson* analysis, as follows.

A.      **Race-Neutral Explanation**

At step two of the *Batson* analysis, the state must "offer a reasonably specific explanation that the court can use to determine whether that reason is related to the case being tried." *Id.* at 211 (emphasis omitted). The explanation "need not be persuasive or even plausible," *Martin*, 773 N.W.2d at 101, and "will be deemed race-neutral unless a

7

discriminatory intent is inherent in the . . . explanation," *Pendleton*, 725 N.W.2d at 726 (quotation omitted).

The prosecutor told the district court that its race-neutral reason for striking Prospective Juror 7 was based on Prospective Juror 7's description of his involvement in a car accident and his analysis of fault. During voir dire, Prospective Juror 7 admitted that he once rear-ended a student driver who stopped abruptly when a traffic light turned yellow. Prospective Juror 7 acknowledged that he should have given the student driver more space, especially because it was raining and hailing at the time. But Prospective Juror 7 maintained that he was not "100 percent at fault" and that the student driver probably should have proceeded through the yellow light instead of "slamming the brake right away." When explaining the state's reason for striking Prospective Juror 7, the prosecutor focused on how Prospective Juror 7 "stuck to his guns that a large part of [the accident] could have been avoided if [the] driver ahead of him would have simply . . . gone through the intersection." The prosecutor told the district court that the state believed it would be inappropriate to seat Prospective Juror 7 in a case that involved comparing the fault of drivers involved in an accident. The district court concluded that the state's proffered reason was nondiscriminatory. We agree.

The state's justification for the strike concerned a race-neutral topic relevant to Dennis-Bond's trial—namely, comparative fault in motor-vehicle accidents. Thus, the state's proffered reason was "reasonably specific," "related to the case being tried," and not inherently discriminatory. *See Lufkins*, 963 N.W.2d at 210-11. We therefore conclude

8

that the district court did not clearly err in its determination that the state articulated a nondiscriminatory justification for the strike.

## B. Pretext

At step three of the *Batson* analysis, the challenging party must prove "that the peremptory strike was motivated by racial discrimination and that the proffered reasons were merely a pretext for the discriminatory motive." *Pendleton*, 725 N.W.2d at 726 (quotation omitted). The district court determined that there was "not a sufficient basis to find that purposeful discrimination ha[d] been established." Dennis-Bond argues that the district court clearly erred and that pretext is evident from the record because (1) the state mischaracterized Prospective Juror 7's answers and (2) the state did not use a peremptory strike on a white juror who provided "similar" answers to Prospective Juror 7. As follows, we are not persuaded by either argument.

### 1. Factually Incorrect Information

Dennis-Bond asserts that the prosecutor offered "factually incorrect" information in support of the race-neutral justification by mischaracterizing Prospective Juror 7's answers during voir dire. Dennis-Bond argues that this mischaracterization is evidence that the prosecutor's justification was merely a pretext for a discriminatory motive and that the district court clearly erred when it found otherwise.

Dennis-Bond is correct that there was a discrepancy between one of Prospective Juror 7's answers and the prosecutor's characterization of that answer. During questioning, Prospective Juror 7 admitted that he should have given the student driver more space. By contrast, in response to Dennis-Bond's *Batson* challenge, the prosecutor recounted that

9

Prospective Juror 7 "did not, in any of his [answers], as the [s]tate recalls, talk about what he could have done differently" to avoid the accident. The state does not dispute that the prosecutor's recollection of Prospective Juror 7's answer "was not entirely correct." But the state contends that "the crux of the [s]tate's basis for striking [Prospective Juror 7] had to do with his statements about fault, which the prosecutor accurately stated." The state's argument is persuasive.

In *State v. Gomez*, the prosecutor used a peremptory strike on a Black prospective juror who believed that her father had been wrongly convicted of a crime because there was insufficient evidence of his guilt. 721 N.W.2d 871, 883-84 (Minn. 2006). The prosecutor explained that they struck the prospective juror because she was still convinced that her father was wrongly convicted. *Id.* at 884. Gomez argued that the prosecutor exaggerated the prospective juror's answer by describing the juror's "family having gone to some length to examine the evidence of her father's guilt." *Id.* The supreme court held that, even if the prosecutor exaggerated the prospective juror's response, "it was not an exaggeration of [the prospective juror's] belief that her father was wrongly convicted, the reason for the strike." *Id.*

Here, regardless of the prosecutor's mischaracterization of Prospective Juror 7's answer to the question of what he could have done differently to avoid the accident with the student driver, the record reflects that Prospective Juror 7 nonetheless attributed some fault to the student driver. And the state's proffered reason for striking Prospective Juror 7 was because of "how he assigned fault to this person that he rear-ended." Thus, as in *Gomez*, the prosecutor's exaggeration of the degree to which Prospective Juror 7 attributed

10

fault to the student driver was not an exaggeration of Prospective Juror 7's belief that he was not "100 percent at fault" for rear-ending another driver. *See id.* Because this case involved, in part, a determination of who was at fault for causing a collision, it was reasonable for the state to strike Prospective Juror 7 based on his perception of comparative fault. We discern no reason to conclude that the prosecutor's limited misstatement shows that the reason given by the state for striking Prospective Juror 7 was a pretext for discrimination.

### 2. The State's Refusal to Strike a Comparable White Juror

Dennis-Bond also argues that the state's refusal to strike Prospective Juror 24, who is White and was also questioned about fault in a car accident, is further evidence of pretext. Prospective Juror 24 explained that she was involved in a car accident when she hit another vehicle after she drove through a stop sign without stopping. When asked whose fault the crash was, Prospective Juror 24 emphasized that she could not see the stop sign because it was obscured by overgrown branches, but she did acknowledge that she hit the other vehicle. She also agreed that, had the stop sign been visible, the accident would have been her fault.

While both Prospective Jurors 24 and 7 answered questions about attributing fault in a car accident, Prospective Juror 24's answers are distinguishable from the answers of Prospective Juror 7 because Prospective Juror 24 did not attribute fault to the other driver. Instead, she stated that the accident occurred because she did not see the obstructed stop sign. And so, the prosecutor may have reasonably concluded that Prospective Juror 24's experience would not bias any decision in Dennis-Bond's trial regarding the central issues

11

of evaluating causation and fault among drivers. Thus, the state's decision not to strike Prospective Juror 24 does not suggest that the state struck Prospective Juror 7 solely because of his race.

In sum, Dennis-Bond has not demonstrated that the prosecutor's reason for striking Prospective Juror 7 was pretextual. Accordingly, we conclude that the district court did not clearly err by determining that Dennis-Bond failed to prove purposeful discrimination under step three of the *Batson* analysis or by denying Dennis-Bond's *Batson* challenge. *See Martin*, 773 N.W.2d at 101.

## II. The evidence was sufficient for a jury to conclude beyond a reasonable doubt that Dennis-Bond was a proximate cause of the victims' deaths and injuries.

Next, Dennis-Bond argues that her convictions of third-degree murder, criminal vehicular homicide, and criminal vehicular operation should be reversed because there was insufficient evidence produced at trial "to prove beyond a reasonable doubt that her driving conduct was a substantial factor in *causing* the accident." We are not persuaded.

When considering a challenge to the sufficiency of the evidence, "we conduct a painstaking review of the record to determine whether the evidence and reasonable inferences drawn therefrom, viewed in a light most favorable to the verdict, were sufficient to allow the jury to reach its verdict." *State v. Hohenwald*, 815 N.W.2d 823, 832 (Minn. 2012) (quotation omitted). We must "assume the jury believed the state's witnesses and disbelieved contrary evidence." *State v. Stein*, 776 N.W.2d 709, 714 (Minn. 2010) (quotation omitted). "We will not disturb a verdict if the jury, acting with due regard for the presumption of innocence and for the necessity of overcoming it by proof beyond a

12

reasonable doubt, could reasonably conclude that the defendant was proven guilty of the offense charged." *State v. Flowers*, 788 N.W.2d 120, 133 (Minn. 2010) (quotation omitted).

"[T]he [s]tate bear[s] the burden of proving beyond a reasonable doubt every element of a charged offense in a criminal trial." *State v. Pakhnyuk*, 926 N.W.2d 914, 919 (Minn. 2019). The causation elements of third-degree murder, criminal vehicular homicide, and criminal vehicular operation are the only elements that Dennis-Bond challenges on appeal. *See* Minn. Stat. §§ 609.195(a) ("Whoever, without intent to effect the death of any person, *causes* the death of another by perpetrating an act eminently dangerous to others and evincing a depraved mind, without regard for human life, is guilty of murder in the third degree . . . ." (emphasis added)), .2112, subd. 1(a)(1) ("[A] person is guilty of criminal vehicular homicide . . . if the person *causes* the death of a human being . . . as a result of operating a motor vehicle: (1) in a grossly negligent manner[.]" (emphasis added)), .2113, subd. 1(1) ("A person is guilty of criminal vehicular operation resulting in great bodily harm . . . if the person *causes* great bodily harm to another . . . as a result of operating a motor vehicle: (1) in a grossly negligent manner[.]" (emphasis added)).

The applicable statutes do not define "cause," but Minnesota law provides that the causation element is assessed in terms of proximate cause. *See State v. Smith*, 119 N.W.2d 838, 848-49 (Minn. 1962) (applying the substantial-factor test and proximate-cause principles to a previous version of the third-degree murder statute);[2] *State v. Jaworsky*, 505

---

[2] We are not aware of any court applying the proximate-cause or substantial-factor test to the cause element of third-degree murder under section 609.195(a). But the supreme court

13

N.W.2d 638, 643 (Minn. App. 1993) (observing that "[c]riminal vehicular homicide and criminal vehicular operation are derived from involuntary manslaughter" and thus that an actor must proximately cause death or injury to be found guilty of those offenses), *rev. denied* (Minn. Sept. 30, 1993); *State v. Smith*, 819 N.W.2d 724, 728 (Minn. App. 2012) (explaining that "Minnesota law requires the state to prove that the act of operating a motor vehicle was the proximate cause of the victim's death" for a person to be convicted under the criminal-vehicular-homicide statute), *aff'd*, 835 N.W.2d 1 (Minn. 2013); *State v. Nelson*, 806 N.W.2d 558, 562 (Minn. App. 2011) (same), *rev. denied* (Minn. Feb. 14, 2012).

"A proximate cause is something that played a substantial part in bringing about the death or injury." *Smith*, 819 N.W.2d at 728 (quotation omitted). "There can be more than one cause of harm." *State v. Hofer*, 614 N.W.2d 734, 737 (Minn. App. 2000). An intervening, superseding cause of harm can limit a defendant's liability for their own culpable conduct if it breaks the chain of causation. *Id.* An intervening cause is considered a superseding cause, however, only if four conditions are met:

---

has routinely observed that the cause element of various homicide offenses requires proof that the defendant's acts were a substantial causal factor in the victim's death. *See State v. Olson*, 435 N.W.2d 530, 531, 534 (Minn. 1989) (applying the substantial-factor test to second-degree murder and first-degree manslaughter); *State v. Sutherlin*, 396 N.W.2d 238, 240-41 (Minn. 1986) (applying the "substantial causal factor" test to first-degree murder). The pattern jury instructions for third-degree murder also define "cause" as "a substantial factor in causing the death." 10 *Minnesota Practice*, CRIMJIG 7.15 (2023). Finally, the parties do not dispute that the proximate-cause standard applies to the cause element of third-degree murder under section 609.195(a). For these reasons, we assume without deciding that the cause element of section 609.195(a) is assessed under the proximate-cause lens.

1) its harmful effects must have occurred after the original negligence; 2) it must not have been brought about by the original negligence; 3) it must have actively worked to bring about a result which would not otherwise have followed from the original negligence; and 4) it must not have been reasonably foreseeable by the original wrongdoer.

*Id.* But "[w]hen the acts or omissions of two or more persons combine to bring about a harmful result, those acts or omissions are concurring causes of the harm." *Id.*

Dennis-Bond contends that the evidence was insufficient for the jury to find beyond a reasonable doubt that her conduct was a proximate cause—i.e., played a substantial part in the deaths and injuries at issue—because her car did not collide with the CRV. Instead, she argues that the evidence establishes that L.B.'s driving conduct was a "superseding intervening cause of the accident." We disagree.

We have already addressed a similar issue in another case, in which multiple drivers were speeding in concert and a collision with an uninvolved vehicle ensued. *See In re Welfare of C.P.W.*, 601 N.W.2d 204, 209-10 (Minn. App. 1999), *rev. denied* (Minn. Nov. 23, 1999). *C.P.W.* involved a high-speed car chase where a driver, J.M.P., was pursued by three vehicles, including one driven by C.P.W., a juvenile. *Id.* at 206. The chase proceeded through a residential area, where the drivers travelled between 55 and 90 miles per hour. *Id.* Eventually, J.M.P. ran a red light and struck another car, killing one person and injuring several others. *Id.* As a result, the state filed a delinquency petition charging C.P.W. with one count of criminal vehicular homicide and several counts of criminal vehicular operation. *Id.* at 206-07. At the probable-cause hearing, "[t]he district court concluded C.P.W.'s driving was not the proximate cause of the collision because

15

J.M.P.'s decision to speed through the intersection was a superseding intervening force breaking the chain of causation." *Id.* at 207. The state appealed that determination. *Id.*

We reversed the district court's determination that the state lacked probable cause to charge C.P.W. *Id.* at 210. We concluded that, even though C.P.W.'s vehicle "was not physically involved in the accident, C.P.W. was such an active participant in the ongoing course of conduct that he was effectively a proximate cause of the accident." *Id.* at 209. We determined that the evidence showed that "C.P.W. and J.M.P. were not acting independently of each other" and were "jointly engaged in conduct demonstrating a conscious disregard for the safety of the public." *Id.* We held that J.M.P.'s driving was not a superseding cause because there was "substantial evidence that J.M.P.'s decision to run the final red light was the natural end of the sequence of events, not an unrelated event that altered the likely result of the dangerous car chase." *Id.* at 209-10.

Similarly, here, we conclude that there was sufficient evidence for the jury to find beyond a reasonable doubt that Dennis-Bond's conduct was a proximate cause of the deaths and injuries even though her vehicle was not physically involved in the accident. Further, the evidence was sufficient for the jury to find that L.B.'s decision to speed through the intersection was not a superseding cause. At trial, Dennis-Bond's passenger testified that, just prior to the collision, Dennis-Bond and L.B. talked through open car windows while stopped at a red light. The two specifically discussed "who could accelerate faster from the stoplight." The passenger added that both Dennis-Bond and L.B. "accelerated quickly" once the light turned green. Similarly, another driver, who was stopped behind the cars at

16

the red light, confirmed that the cars had their windows lowered and there was "a lot of talking" between the cars. After the light turned green, the cars "took off."

At an ensuing intersection, a driver waiting to make a U-turn witnessed the cars speed past her. The driver noted that one car "was just slightly in front of the other and they were going at a high rate of speed and it appeared like they were racing." Moments later, the driver witnessed the collision between L.B.'s Chrysler and the red CRV.

Yet another driver testified that, while stopped at a red light to cross County Road 42, he saw two cars racing at "horrific" speeds. The driver testified that the cars "were really close to each other" and it appeared that "one of them was trying to kind of get up past the other one." After the cars passed him, the driver looked down for a moment before looking up again and saw the collision.

Finally, the sergeant, who is a crash-reconstruction specialist, testified that L.B.'s speed was the "primary factor" for the crash and Dennis-Bond's "comparable speeds with the Chrysler" was a secondary factor. The sergeant added that Dennis-Bond and L.B. appeared "to keep their speeds together," which, in his experience as a state trooper, indicated they were racing. The sergeant added that the CRV "would have cleared the intersection significantly" had Dennis-Bond and L.B. not been speeding.

The evidence, viewed in the light most favorable to the verdict, demonstrates that Dennis-Bond and L.B. were not acting independently of each other. The evidence indicates that the racing was initiated by Dennis-Bond's banter with L.B. and her rapid acceleration at the stoplight, and that Dennis-Bond continued to play an active role in the racing by jockeying for position with L.B. The evidence also shows that the two were racing at

17

"horrific" speeds and entered the intersection where the collision occurred nearly simultaneously. The mere fact that Dennis-Bond avoided the collision does not diminish her active participation in the racing prior to the collision. A reasonable juror could conclude that Dennis-Bond played a substantial part in bringing about the deaths and injuries. And the evidence was sufficient to conclude that L.B.'s decision to speed through the final intersection "was the natural end of the sequence of events." *See C.P.W.*, 601 N.W.2d at 210. L.B.'s speeding was not a superseding cause because it was "not an unrelated event that altered the likely result of the dangerous [racing]."[3] *Id.* Accordingly, taken in a light most favorable to the verdict, the evidence was sufficient for the jury to find Dennis-Bond guilty of third-degree murder, criminal vehicular homicide, and criminal vehicular operation.

### III. The district court did not abuse its discretion by denying Dennis-Bond's motion for a downward dispositional or durational departure.

Finally, Dennis-Bond argues that the district court abused its discretion by denying her motion for a downward dispositional or durational departure at sentencing. We disagree.

---

[3] Dennis-Bond also suggests that the victim's decision to turn through the intersection without yielding to L.B. and Dennis-Bond was a superseding cause of the collision. We reject this argument for two reasons. First, "[t]he driver of any vehicle traveling at an unlawful speed shall forfeit any right-of-way which the driver might otherwise have." Minn. Stat. § 169.20, subd. 1(d) (Minn. 2020). Second, the sergeant testified that the CRV would have made it through the intersection if not for Dennis-Bond's and L.B.'s speeds. Accordingly, the jury could reasonably conclude that Dennis-Bond caused the collision and that the CRV's entrance into the intersection was not a superseding cause.

District courts have broad discretion in deciding whether to depart from a presumptive sentence. *State v. Kindem*, 313 N.W.2d 6, 7 (Minn. 1981). We will not disturb a district court's refusal to depart "absent a clear abuse of that discretion." *State v. Oberg*, 627 N.W.2d 721, 724 (Minn. App. 2001), *rev. denied* (Minn. Aug. 22, 2001). A district court abuses its discretion if its decision "is based on an erroneous view of the law or is against logic and the facts in the record. *State v. Bustos*, 861 N.W.2d 655, 666 (Minn. 2015) (quotation omitted).

The Minnesota Sentencing Guidelines prescribe a presumptive sentence or range of sentences "for offenders for whom imprisonment is proper." Minn. Stat. § 244.09, subd. 5(2) (2020). A district court must pronounce a sentence within the applicable guidelines' range unless it finds "identifiable, substantial, and compelling circumstances to support a departure." Minn. Sent'g Guidelines 2.D.1 (2020). But a district court is not required to depart even when substantial and compelling circumstances are present. *See State v. Back*, 341 N.W.2d 273, 275 (Minn. 1983) ("[W]e will not interfere with a sentence that falls within the presumptive sentence range even if there are grounds that would justify departure.").

At sentencing, Dennis-Bond moved for a downward dispositional or durational departure. "A dispositional departure places the offender in a different setting than that called for by the presumptive guidelines sentence." *State v. Solberg*, 882 N.W.2d 618, 623 (Minn. 2016). "A dispositional departure typically focuses on characteristics of the defendant that show whether the defendant is particularly suitable for individualized treatment in a probationary setting." *Id.* (quotation omitted). By contrast, a durational

departure concerns the length of the sentence and "must be based on factors that reflect the seriousness of the *offense*, not the characteristics of the offender." *Id.*

In her motion for a downward dispositional departure, Dennis-Bond sought probation and a stay of the presumptive prison sentences for her convictions. In support of her motion, Dennis-Bond focused on the qualities that made her particularly suitable for probation, including that she (1) was only 19 years old at the time of the accident; (2) had "aspirations of going to the National Guard, attending college, and [attending] law school"; (3) had no prior adult criminal history; (4) had no new violations and had abided by court orders while on conditional release; (5) had strong family and community support; and (6) showed remorse and "regrets speeding, yelling at the Honda CRV, the lives lost, and most importantly, realizes she must make better decisions."

And, in support of her motion for a downward durational departure, Dennis-Bond noted that she "was not involved directly in the accident at all" and "avoided the collision entirely." Dennis-Bond also argued that the driver of the CRV "failed to yield as required and pulled out in front of traffic travelling eastbound on County Road 42." Dennis-Bond argued that these facts lessened the seriousness of the offense.

The district court declined to grant Dennis-Bond's motion for a dispositional departure, stating that Dennis-Bond failed to demonstrate "a substantial and compelling reason" to conclude that she was amenable to probation. The district court emphasized that, although Dennis-Bond complied with the conditions of release during the trial, she was also cited twice for speeding since the accident. The district court also declined to grant a durational departure for any of the three convictions at issue. The district court

stated that granting Dennis-Bond's motion "would diminish or minimize the facts that led to the crash, which was driving down the highway at twice the legal limit, at roughly 100 miles an hour."

Renewing the arguments she made at sentencing, Dennis-Bond contends that the district court abused its discretion in denying her motion for a downward dispositional or durational departure when it imposed sentences for her two convictions of third-degree murder and her conviction of criminal vehicular operation. We are not persuaded.

Even if a mitigating factor justifies departure, we will not ordinarily interfere with the imposition of a presumptive sentence. *See State v. Bertsch*, 707 N.W.2d 660, 668 (Minn. 2006); *State v. Musse*, 981 N.W.2d 216, 222 (Minn. App. 2022), *rev. denied* (Minn. Dec. 28, 2022). Moreover, when the record shows that the district court carefully evaluated the testimony and information presented, we "*may not* interfere" with the district court's decision not to depart. *State v. Van Ruler*, 378 N.W.2d 77, 80-81 (Minn. App. 1985) (emphasis added). Refusals to depart will be reversed only in "rare" cases. *Kindem*, 313 N.W.2d at 7.

This is not the rare case that warrants reversal. At the sentencing hearing, the district court considered a number of victim-impact statements, Dennis-Bond's arguments for departure, Dennis-Bond's presentence investigation report, and the sentencing guidelines before imposing sentences for third-degree murder and criminal vehicular operation. The sentences imposed by the district court were each within the presumptive sentencing range under the guidelines. Because the record reflects that the district court carefully evaluated the testimony and information presented at sentencing and imposed presumptive sentences,

21

we "may not interfere with the [district] court's exercise of discretion." *Van Ruler*, 378 N.W.2d at 80-81. We conclude that the district court did not abuse its discretion by denying Dennis-Bond's motion for a downward dispositional or durational departure when imposing sentences for the convictions of third-degree murder and criminal vehicular operation.

**Affirmed.**